THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOYCE HART, Defendant-Appellant.
First District (1st Division)    No. 79-1764

Opinion filed December 29, 1980.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Alfred Petrocelli, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Joyce Hart, was convicted of burglary in a bench trial and sentenced to 24 months probation. Upon noting the defendant desired to join the United States Air Force, the trial judge stated that if defendant was accepted he would terminate her probation. She appeals, contending (1) that the trial court erred in recommending at the conclusion of her testimony that she purchase and listen to the lyrics of the hit record "Bad Girl" because it indicated that the court had made up its mind to find her guilty prior to the completion of the trial, and (2) her constitutional rights were violated by the State's cross-examination.

No contention is made that the defendant was not proved guilty

beyond a reasonable doubt. The proof of defendant's guilt was overwhelming.

The parties stipulated that Robert McMiller, if called to testify, would testify that on August 8, 1978, he was the owner of a store at 2308½ East 71st Street called "Fashion Jeans"; that he did not give permission to Joyce Hart to enter the store on that date, and that at 5 a.m. on that day the store was not open for business.

On August 8, 1978, Tyrone Wilson worked as a salesman and night watchman in the used clothes store at 2310 East 71st Street, next door to McMiller's store. Wilson lived with his wife above the used clothes store. On that morning, he was awakened by the sound of the bars on the window breaking, followed by the sound of breaking glass. He ran to the front window. When he looked down, he saw defendant standing in front of McMiller's store looking from side to side. Wilson had seen the defendant six to seven times before when he (Wilson) was working in McMiller's store. Wilson saw two men run out of the store and then a third person, carrying a bundle of jeans. Until the third man emerged, defendant was standing on the sidewalk looking up and down the street. When the man with the bundle left the store, defendant followed him.

Wilson ran down the stairs, out to the street, waved down the approaching police and showed them where defendant and the men had run. Wilson ran to the corner of 71st and Crandon and from there saw the man who had left the store with the bundle throw it behind some bushes. The police officer also saw this. After thus disposing of the jeans, the man, later identified as David Bivens, stepped beside defendant and put his arm around her. The two then began to walk north on Crandon. Wilson told the police, "There they go, right there." The officer stopped the squad car next to the couple and Wilson came up and said, "That's them." Bivens said "That's who?" Wilson replied, "You nigger, you broke into my store." The police found 14 pairs of blue jeans behind the bushes. After placing defendant and Bivens under arrest, the officers returned to the store at 2308½ East 71st Street and found that the window was broken.

Defendant testified that between 3 and 3:30 a.m. she went to David Bivens' godmother's house with him. Between 3:30 and 4 a.m. Bivens and defendant left his house. Bivens was walking her home. When they reached 71st and Crandon, he told her to keep walking, which she did, going north on Crandon. Bivens walked toward 71st and Oglesby.

Defendant testified that she saw a friend, a Marie Jackson or Johnson. She spoke to Marie and, while standing there talking, five "dudes" and a girl ran past them. She had seen the girl before. Defendant, asked if she noticed anything about this girl's clothing, replied, "Me and her had the same kind of scarf she had on. Maybe I would say some blue jeans." Defendant further testified that Marie told her to run, but she

replied what for and started walking. Soon Bivens came up behind her and told her to keep walking. She kept walking; suddenly Wilson ran around the corner and told them to stop. They stopped. Defendant testified Wilson was cussing at them, so she cussed back. Then the police came in their squad car and asked her what she was doing out there. At this point, Wilson accused them of breaking into his store. One of the officers went to the bushes and got the blue jeans and the other asked her how old she was. She told him she was 17. At this point, they called the paddy wagon and placed her under arrest.

Defendant further testified that she was not in front of the store at 2308½ East 71st Street on August 8, 1978, and that she didn't go into or near the store on that date.

On cross-examination, the assistant State's attorney asked defendant a series of questions concerning what she told the police about Marie that night and concerning her previous experiences with David Bivens. Defendant's objections to these questions were overruled.

Upon the completion of her testimony, the court asked defendant if she had the new Donna Summers single. When she said no, the court replied, "I suggest you buy it and listen to the lyrics. It's called 'Bad Girl.'"

Defendant called David Bivens. He testified that while he was walking defendant home from his house at approximately 3:30 or 4 a.m. he saw some people breaking into a store and that he told defendant to go home; she said he shouldn't go down there. He testified he then went to where the burglary was happening and that when he was at the store he didn't see defendant. He and two other men went into the store. When he came out, he ran around the corner at Crandon and put the clothes in the bushes. He said that defendant was still down the street, so he ran up to her and put his arm around her. While he was walking with her, a young man came up with the police and somebody said stop. The man with the police said, "He did it, and she was there, too, just like that, because she had on a white scarf or something like that." Bivens testified that he saw someone else with a white scarf.

Defendant argues that error was committed because the trial judge, before the completion of the trial, indicated by his comments that he had already made up his mind that defendant was guilty. The record shows that at the conclusion of defendant's testimony the following occurred:

"PUBLIC DEFENDER: I have nothing further, your Honor.

THE COURT: Miss Hart, do you have the Donna Summers new hit single?

DEFENDANT: No.

THE COURT: I suggest you buy it and listen to the lyrics. It's called bad girl. Okay, you may step down."

Defendant argues that the lyrics of this song (set out in the supplemental

record) indicate that "the trial judge was saying that Joyce Hart was not only a 'bad girl' herself and had committed the instant case offense but indeed, was someone in the nature of a prostitute, even though Ms. Hart had never remotely testified to this, nor had any witness, State or defense. The inexorable [*sic*] conclusion is that the court felt Ms. Hart had assisted David Bivens in the burglary in question, perhaps from motives similar to that of a prostitute." We disagree. This was a bench trial.

In *People v. Cannon* (1974), 18 Ill. App. 3d 781, 791, 310 N.E.2d 673, the court dismissed a claim of prejudice from the trial judge's remarks, saying:

> "Far from finding this conclusion to be a 'natural inference' from the judge's statement, as contended by counsel, we find it to be a complete and unsupportable *non sequitur*."

■■ So too here; the trial court's statement to defendant at the hearing in aggravation and mitigation clearly indicates that the import of his earlier reference to the lyrics of the song "Bad Girl" was an admonition to avoid association with bad men. The court said:

> "I would suggest that you are skating on thin ice. I am skating on thin ice because I am preaching now that you have a habit that I think will get you in trouble, that the men you associate yourself with are not really men. They are going to lead you one day, if you don't change your attitude and change the type of man that you decide you are going to associate with, they will lead you into a situation that is much more dangerous, maybe fatal to you, than what you have experienced up to the present time.
>
> I suggest that you have a complete reassessment of the type men you want to deal with, because right now you don't have a very good track record about the type people you run around with, particularly male people."

The prior reference to the lyrics of the song was not an indication that the court, before the conclusion of the trial, had made up his mind to find her guilty and did not constitute reversible error.

■■ Defendant contends that her constitutional rights were violated by the State's cross-examination. After questions concerning her previous activities with Bivens and her discussion with the police that night, the following took place:

> "ASST. STATE'S ATTORNEY: Did you commit burglaries before with David Bivens?
>
> DEFENDANT: No.
>
> PUBLIC DEFENDER: Objection.
>
> THE COURT: Overruled.
>
> ASST. STATE'S ATTORNEY: Had you been a look-out before August 8th, 1978?

DEFENDANT: No, I wasn't a look-out for him."

Although it would have been better if this line of questioning had not been pursued, defendant was not prejudiced because Wilson had testified that after hearing the breakin he saw defendant standing outside looking from side to side until the third man ran out of the store carrying a bundle, at which time defendant then left, following that man.

On cross-examination, defendant was asked about the people, including a girl, who had run past her and her friend Marie and whom defendant had testified on direct examination that she had seen before. Defendant claims error in the further questions:

"Q. What was the girl's name?

A. I don't know her name.

Q. Where had you seen her before?

A. Around the house.

Q. Around your house?

A. Yes.

Q. How many times did you see her before?

A. I don't know. I really can't say. I seen her different times, because she was going to the same school I went to.

Q. She went to South Shore High School?

A. Yes.

Q. Did she have any classes with you?

A. No.

Q. So, you had seen her many times before?

A. Yes.

Q. Did you tell the police that you had seen that same person many times before?

A. Yes.

PUBLIC DEFENDER: Objection, your Honor, as to whether or not she said anything to the police.

THE COURT: Overruled.

ASST. STATE'S ATTORNEY: Q. Did you tell the police that?

A. They seen her —

Q. Answer my question.

A. Yes. Yes."

She also claims further error in the following cross-examination:

"Q. When you were standing—when the police came up, did you tell them how long you had been there?

A. No.

PUBLIC DEFENDER: Your Honor, I'm going to continuously object.

THE COURT: Okay, and I'm going to continuously overrule your objections.

PUBLIC DEFENDER: As to anything that she did not or did say to the police. There is a Fifth Amendment Right when your're stopped by the police.

THE COURT: Objection overruled.

Q. Was Marie there when the police came up and arrested you?

A. No.

Q. Where did Marie go?

A. She ran.

Q. When did Marie run?

A. When all the boys ran.

Q. Why didn't you run?

A. What was I going to run for?

Q. I asked you why didn't you run?

A. Because I figured I wasn't doing nothing wrong.

Q. You felt you weren't doing nothing wrong? Did you tell the police that?

A. Yes.

Q. Who did you tell?

A. I told the officer that was talking to me. I said why should I run. He said well, people be running when they hear the police come, and I said well, I don't, so you going to shoot me in my back or something?"

■■ We find no error in this cross-examination. Defendant had testified on direct examination that she had seen her friend Marie, had stopped to talk to her and that when the police came they asked her what she was doing there. She was not arrested until after the blue jeans were found in the bushes. Cross-examination about her pre-arrest silence in order to impeach her credibility does not constitute a violation of her fifth amendment rights. In *Jenkins v. Anderson* (1980), 447 U.S. 231, 239, 65 L. Ed. 2d 86, 94, 100 S. Ct. 2124, 2129, the court, in so holding, said:

"A defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' *Brown v. United States*, 356 U.S. 148, 156, 2 L. Ed. 2d 589, 78 S. Ct. 622, 72 A.L.R.2d 818 (1958)."

No questions were asked of defendant concerning what she said or didn't say after her arrest. Her constitutional rights were not violated. Defendant was not prejudiced.

We also note that the scope of cross-examination of a defendant who takes the stand rests within the sound discretion of the trial court, and a

court of review will not interfere absent a clear abuse of that discretion resulting in prejudice. (*People v. Coles* (1979), 74 Ill. 2d 393, 395-96, 385 N.E.2d 694; *People v. Williams* (1977), 66 Ill. 2d 478, 487, 363 N.E.2d 801.) We find no such abuse of discretion and no resulting prejudice.

Defendant's conviction and sentence are affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.