THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRED EARULLO *et al.*, Defendants-Appellants.

First District (5th Division)   No. 82—454

Opinion filed March 25, 1983.

Edward J. Egan and Samuel V.P. Banks, both of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and James B. Koch, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendants (Chicago police officers) were convicted of involuntary manslaughter and official misconduct. Klisz was sentenced to an extended term of eight years for the former and five years for the latter, the sentences to run concurrently, and Earullo was sentenced to concurrent terms of 2½ years for each offense. On appeal, they contend that (1) they were not proved guilty beyond a reasonable doubt; (2) the trial court erred (a) in denying their motion for a mistrial based upon alleged prejudicial newspaper coverage and (b) in permitting the State to show that Klisz refused to make a statement; (3) the court improperly refused to consider certain evidence; and (4) their sentences were excessive.

A number of witnesses testified for the State to an occurrence on July 6, 1980, which began on an elevated train and continued to the concourse of the 35th Street CTA station.

Farris King was seated in the first car of the train when he saw a black man run to the back of the car, followed by a short white man with dark hair and a taller white man. The black man held his left hand behind his back and told them "not to come up on him," but a third and larger white man with a red beard and moustache entered the car, dove into the black man, and held him in a headlock. The three white men wrestled the black man to the floor and, after handcuffing his hands behind his back, the two taller white men lifted him from the floor—one on each side holding his arms. The black man was hollering "No," and King saw the man with the red beard give the black man a rabbit punch in the stomach. The man with the red beard explained to the others on the train that they were police officers and the man was under arrest. The black man was led off the train by the three men. King did not see the black man's head go through a window, and he remembered telling detectives a week after the incident that the black man told the officers they had better have a gun if they wanted to arrest him, but he saw no one with a gun.

Beulah Phillips, a switchman on the train, testified that while the

train was stopped at the station, she looked back and saw three plain-clothes policemen taking a black man off the train. The black man walked off the train on his own power, and she did not see any blood on or injury to him. Phillips identified defendants Klisz, Earullo, and Christiano[1] in court as the officers who removed the man from her train.

Blenda Caldwell, who with her husband Michael entered the station at approximately 4:30 p.m., saw a black man and two white men descending the stairs toward her. Each of the white men was holding an arm of the black man, and they were jostling him back and forth. After the three men passed by, she heard a noise and saw the black man thrown up against the wall of the concourse three times by the same two persons she had just passed. The black man's hands were handcuffed behind him, and his whole body, head, chest, and legs struck the wall. While the black man was faced up against the wall, both of the white men punched him in his back and upper ribs. At that point, a woman stopped to ask her for directions, after which she again looked toward the concourse and saw the black man being held up against a post by the man with a slight beard, and then saw the other man with red hair and a big beard bring his leg up twice, but she could not see whether his leg made contact. She then turned around to see where her husband was and, when she looked back, the black man was lying on the ground on his left side with his hands behind him, and she saw the white men kick him eight or 10 times. The black man then rolled over onto his stomach, and the white men stomped on his back while the black man hollered, "Help me, they are trying to kill me." She never saw the black man's hands anywhere other than behind his back, and she did not see him strike either of the white men while she was there—which was about five minutes.

Michael Caldwell testified that he was with his wife Blenda in the concourse area of the station when two white men on either side of a black man came down the stairs toward him. One of the white men was thin with dark hair and the other had long red hair, an earring in his left ear, a bushy red beard, and a moustache. After they passed, he stopped and watched the two white men throw or shove the black man against the wall several times. The man with the beard then held the black man with his back to a cement post, and the thin man kicked him above the knees and below the chest. At that point, he (Caldwell) went to the ticket agent and, after speaking with her, she

---

[1]Christiano was named as a defendant in this case but was discharged at the close of the State's case.

made a phone call. On his way back toward his wife, he saw the black man's head being held on the floor by the man with the red beard, and he heard the black man yell, "Murder, murder." He did not see any other person kick or strike the black man, but he did see a pool of blood under his head and neck. He (Caldwell) identified Klisz in a lineup and in court as the man with the beard.

Willis Crew was in the station near the ticket office where he saw a black man lying on the ground with one white man standing on his feet and another near his head. The former kicked the black man in his side and the other man was hitting him. The black man, who had blood on his face and shirt, said, "Help me, get these people off, call the police." One of the white men responded, "Don't worry about him, he's nuttier than a fruitcake," and he left after two to three minutes.

Marilyn Brodsky, who was in the station returning from a White Sox game with her nephew Jerry and her son, saw a man lying on the ground being kicked by two men, but she did not see their faces because they had their backs to her. While she was on the concourse, she stopped to ask directions from a white woman.

Jerry Lubelcheck, who was with Brodsky and his cousin in the station, saw two men on either side of a black man walking toward a pole. They were punching and kicking the black man and, as he walked up the stairs, he turned around and saw the black man on the ground with the other two men stomping and kicking him.

Donnie Reynolds, also in the station, saw a black man lying on the floor with one white man standing over him and a fat white man with his right knee on the neck of the black man, who was handcuffed and was hollering, "Get him off of me, help me." When he asked what was wrong, one of the white men said it was police business. He saw blood on the ground and blood coming from the right side of the black man's head and, as he walked toward the stairway, he saw the man who had been kneeling strike the black man in the head four times.

Andrew Laties was walking through the concourse of the station when he heard repeated cries for help and saw a black man lying on his stomach, with a stocky-built white man with a dark moustache next to him and a larger white man with light-colored sideburns squatting on the black man's buttocks. The larger man leaned over the black man and hit him twice with his right hand at the base of the skull and top of the neck. When he told the other white man "to stop that" the man replied, "Keep walking, this is police business." The black man was hit a third time by the same white man, and he (Laties) saw a pool of blood at the black man's head. The black man at

that time was prone and was not moving.

Fritz Knaak was in the station after the White Sox baseball game and saw a black man lying on the floor with a white man sitting on top of him. When the black man hollered for help, the white man told him to "shut up" and hit his head on the cement floor at least five times.

John Havelka, a Chicago policeman, in response to a call, went to the station with his partner. There, Klisz, Earullo, and Christiano identified themselves as police officers, and he was told that a black man lying on the ground was under arrest. Earullo was standing on the black man's legs with Klisz and Christiano nearby. He was told the black man had tried to stab them with a pen. He called for a paddywagon, and when it arrived he and Klisz walked the man to the wagon with each holding one of his arms. The black man's arms were handcuffed behind his back, but he walked under his own power and was wearing shoes. From the time the black man was taken from the station concourse to the paddywagon, he did not resist in any way, and the three officers got into the back of the wagon with him. Havelka was at the police station when the black man was assisted into a processing room and put on the floor in a corner by Klisz and the driver of the wagon. He was not walking on his own power; "his feet were like being dragged." He did not have his shoes on, but otherwise appeared the same as when he entered the wagon. Havelka did not see the black man strike or kick anyone and saw no one strike or kick him at any time.

Robert Frenzel, a Chicago police officer, was in the interrogation room processing another arrestee when decedent was brought in by two police officers. Decedent was placed on the floor against the wall, and he "was disheveled, had *** his hands handcuffed behind his back, and a slight trickle of blood on the side of his face" and was shouting obscenities. He saw Klisz bend over and wipe the blood off decedent's face with the man's shirt but saw no one strike, kick, or abuse decedent and did not see decedent strike his head on the wall or on the floor during the four or five minutes he was in the room. While decedent was on the floor, he was belligerent and causing a commotion but he made no complaint of being beaten, and he saw nothing wrong with decedent other than the trickle of blood.

Joseph Cuddy, a field lieutenant, testified that at about 5:30 p.m. Earullo informed him of decedent's arrest and said that he and his partner had found him smoking on an elevated train. Earullo also said he had been stabbed, and he noticed that Earullo had a scratch on the lower left part of his chest. Later, when he went to the interview

room, he saw Officers Frenzel and Christiano seated at desks and decedent on the floor against the wall with his hands cuffed behind his back and blood coming from his nose and lips. Decedent answered his questions only with vulgarity and was combative, abusive, and argumentative. He told the desk sergeant to call for a squadrol to take decedent to the hospital. When he returned later to the interview room, decedent was in the same condition, and an evidence technician was there taking pictures. He did not see anyone strike decedent or see him fall to the floor or hit his head against the wall, and decedent did not complain about having been punched or abused.

Officer Cooley testified that when he arrived at the CTA station he saw a black man lying on the ground with a white male, having a full beard, glasses, and lightish hair sitting on his back, and another with dark hair restraining the man's legs. The black man was attempting to move around and was yelling and screaming obscenities.

Dr. Muhammed Awan, an internal medicine resident at Mercy Hospital, testified that about 6:30 or 7 p.m. emergency resuscitation (CPR) was performed on decedent in the emergency room, following which he was transferred to the intensive care unit in an unconscious state. Later, the intensive care staff again conducted CPR, and he pronounced decedent dead at 9:14 p.m. When he performed CPR in the emergency room, he noticed that decedent's sternum "was more flexible than it should have been," his abdomen was distended, and his lower left leg near the ankle was not in alignment with the upper leg. He said that ribs and the sternum can be broken or fractured during CPR and that decedent was never breathing on his own and had clotted blood in his nose and mouth.

Dr. Barnes, who examined decedent in the hospital emergency room, said that his wrists and ankles were in restraints and he wore no shoes, and that he was confused, disoriented, and could not respond. There was dried blood in both nostrils, he heard air in the right lung—which comes from a ruptured lung, and his chest felt mushy, his abdomen hard, and both ankles were swollen. When decedent's heart and breathing stopped, he started CPR and felt rib fractures and noticed that the sternum was movable. Nowhere in his report did he indicate a finding of fractured ribs or sternum.

Dr. Stein, the Chief Medical Examiner of Cook County, performed an internal and external postmortem examination on decedent and found that decedent had marked swelling over the right eye as well as a contused area indicating the presence of blood underneath the skin, and marked contusions extending through the cheekbone and the nose—their dark red color indicating they were of recent origin.

There was also dark blue, almost dark purple, discoloration compatible with hemorrhage in the right ear, contusions of the frontal area and over the left eye, contusions of the frontal temporal area over the cheekbone and under the left side of the cheek, and contusions with discoloration near the right and left ears. The chest wall showed marked red discoloration extending from the neck area due to dilation of blood vessels, usually from trauma or any irritant, and the back and shoulders had contusions and pinkish discoloration caused by dilation of blood vessels. There were contusions and abrasions on the right foot, the right upper arm, the left wrist, and on the forearms. There were parallel contusions on the wrists compatible with handcuffs, and abrasions and contusions on the elbow joint, kneecap, and left foot. Dr. Stein also found extensive hemorrhaging on the right side of the chest extending to the bottom of the rib cage, with some hemorrhaging on the left side as well as the sternum and the upper and lower abdominal regions. Additionally, he found that the small intestines were dilated, with extensive hemorrhaging near the muscles of the lower back and massive hemorrhaging over the cervical vertebrae with a fracture of a spinous process, fractures of bones in the lower right and left legs, and nine broken ribs. Based upon his internal and external examination, Dr. Stein gave an opinion that the cause of death was due to blunt trauma and testified that laboratory tests revealed no presence of alcohol or drugs in the blood; that there was some blood present in the mouth, but no lacerations or open wounds on the body; that contusions are the result of blunt trauma from someone striking the individual or the individual striking something else; that there was some contusion of the lungs that possibly could have been caused as a result of CPR; that it is possible that some of the ribs could have been broken by CPR, but not all of them; that the contusions had the appearance of having occurred approximately two hours before death; and that the contusions, abrasions, hemorrhaging, and broken bones all occurred before death.

Witnesses for the defense testified as follows:

James Calvin was on the train and saw some police officers enter and ask a black man to get off the train. He refused, and when one of the officers grabbed him by the arm and tried to lead him off, he started swinging and kicking. When the officers got him to the platform, he broke away from them and fell. He did not know whether the black man was handcuffed or how many men took the black man off the train, and he may have told the police a few days after the incident that he was on the platform when the train came into the station.

Louise Carrillo, a conductor in the third car of the train, was waiting to close the doors at the station when Earullo left her car and started walking toward the front of the train. She saw broken glass on the rails and a broken window on the train. Christiano said he wanted to give her his star number and name because the window was broken during the resistance of arrest. She saw the other two police officers standing by the stairs with the man they took off the train and, while she found a broken window, she did not see anyone fall down or a window being broken.

Two persons, a bus driver and a CTA patrolman, said that on June 15, 1980 (the instant occurrence was July 6, 1980), decedent created a disturbance on a bus with an ice pick and was removed by police officers.

Fannie Mae Crew and her four children were in the station and they all saw a black man on the ground yelling, with one white man standing with his foot on the man's knee and another white man with his knee on the man's neck. One said that a policeman told her not to pay any attention to the man because he "is nutty as a fruitcake" and, while all of them saw blood on the man's head, none of them saw the men do anything to the black man.

Officers Walski, Kalafut, and Grillo all arrived at the station in response to a call, where they saw a black man lying on the ground handcuffed and three other police officers. The black man was yelling and kicking his feet, and Klisz was holding his shoulders with his knee up against his back. Later, the black man walked out to the squadrol accompanied by Klisz.

Officer Schumerth, the driver of a squadrol, went to the station in response to a call and picked up three officers and a black man—all of whom got into the back of his vehicle. On the way to the police station, he heard nothing unusual in the back; however, when they arrived, the three officers left the squadrol but the black man resisted coming out, and he and his partner had to physically remove him. He then stood on his own, but because he tried to pull away, they took him under each arm and assisted him into the station to one of the reviewing rooms, where he was put on the floor. The witness did not see anyone hit, kick, or do anything to decedent either in the squadrol or in the police station. About one-half hour later, he was recalled to the station where an evidence technician asked him and his partner to help sit decedent in a chair for a picture. They picked him up and put him into the chair, but he fell out of the chair three times "right onto his head." After the picture was taken, he and his partner took him under each arm and walked him to the squadrol. He resisted entering

the vehicle, and they physically put him in and drove to Mercy Hospital.

Gregory Clayton, a registered nurse at Mercy Hospital, said decedent was "throwing his arms, moaning, kicking his legs" when he arrived, and he was placed on a stretcher with restraints on his wrists and ankles. He smelled some alcohol on decedent's breath and noticed that he had a distorted left ankle with a swollen and tense abdomen. He said that the restraints were not extremely tight, and although he complained of pain in his stomach, he made no complaints as to any other part of his body.

Dr. Hallenbeck, a radiologist at Gottlieb Hospital, testified as follows concerning the X rays of the Cook County Medical Examiner: Those of the skull showed no abnormalities; the film of the left leg showed fractures with multiple fragments of both lower bones, a type of injury which he would not expect to occur as a result of the leg being kicked or stepped on but which would require extreme force; the left leg fractures were recent, within three weeks, and with such an injury the person would not be able to walk; the film of the lower right leg and foot showed a fracture across the fibula which, although painful, would permit walking; the film of the abdomen was underexposed and showed no diagnostic detail other than fractures of recent origin of two ribs on the right side; and the films of other portions of the body were so greatly under or overexposed that no abnormalities were evident. He said that because he did not see a particular rib broken in an X ray did not mean it was not broken, and that a much more accurate way of determining whether a particular bone is broken is an autopsy. He could not tell from the X rays whether there was hemorrhaging in the skull and chest.

Defendants Earullo and Klisz, police officers assigned to the Mass Transit Unit, were on the train when it stopped about 4:30 p.m. at the station. Klisz was in the second car, and when it stopped he exited and noticed Christiano standing in the doors of the first car and heard him yell that "he had a crazy." Earullo, who was in another car, was told by Klisz that Christiano had "a crazy" in the first car. When Earullo opened the end door of the first car, the door pushed decedent forward. He lunged at Earullo, struck him in the right side, and said, "You'll need a gun to take me." Decedent and the other three officers struggled as they tried to arrest and handcuff him, and according to Klisz, decedent was kicking, swinging at them, throwing body blocks, and during the struggle broke a window with his head. When they brought him to the platform, he bolted forward and fell. Both witnesses denied striking decedent's head to the floor of the

train or to the ground. Earullo and Klisz each said they proceeded on either side of decedent, down the stairwell to the concourse where decedent bolted forward, lunged into the wall, and started kicking and swearing at them. Neither of them threw him against the wall, but when they attempted to search him against the wall he kicked and yelled and slipped to one knee, so they put him in a prone position on his stomach to complete the search. Klisz knelt next to him and patted him down and, because decedent was kicking, Earullo stepped on his pants legs but neither of them, nor anyone else in their presence, kicked, stomped, struck, or slapped decedent. After Christiano called for assistance, Officers Grillo, Kalafut, and Walski and a wagon crew arrived. Klisz and another officer assisted decedent, and the wagon crew put him in the squadrol. Klisz, Earullo, and Christiano also got into the wagon. On the way to the police station no one struck, kicked or beat decedent, but decedent did try to kick Klisz, who placed him into the floor well between the bench-type seats. When they left the wagon at the station, the wagon personnel had to remove him and, after they got him out, he walked under his own power between the wagon officers, but when he straightened his legs and refused to walk, Klisz assisted them in bringing him to the interrogation room where he was seated on the floor. According to Earullo, decedent was "shouting obscenities, kicking at the furniture. He was just shaking, shrugging his shoulders, bouncing against the wall." Additionally, Earullo said that the evidence technician took pictures of his own chest injury, and he was then driven to Mercy Hospital where he was treated and released; that he never struck decedent with his feet or pounded his head or other body parts on the wall or floor at the concourse or the police station; that he did not see decedent strike or kick Klisz in the concourse; that on July 6, Klisz had a reddish blonde full bush beard, and he (Earullo) had a shorter beard, but he shaved his beard before the lineup; that the police and arrest reports covering the incident do not say anything about decedent using profanity, bolting into a wall, resisting or struggling in the concourse area or in the squadrol; that decedent had to be assisted out of the squadrol; and that he did not see Klisz injure his hand. Klisz also stated that he did strike decedent on the train but neither he nor anyone in his presence struck, beat, or kicked decedent at the station, in the concourse, or in the wagon; that in the processing room, he saw decedent throw himself out of a chair; that he (Klisz) was taken to Mercy Hospital to have his hand examined because his fingertips were black and blue and very painful; that he never found any weapons on decedent and that he never saw him backed up against a pillar.

There was testimony from two police officers that Earullo had a reputation as a truthful, law-abiding individual, and two other persons gave the same testimony as to Klisz.

Officer Naujokas, an evidence technician, testified in rebuttal that while he was in the interview room decedent was not violent. He saw no one prop him up in a chair, nor did he see decedent fall out of a chair, but he did see him in a chair. He was not in the interrogation room the entire time decedent was there.

OPINION

■ Defendants first contend that their guilt was not established beyond a reasonable doubt. In this regard, they initially maintain that the convictions for involuntary manslaughter should be reversed, because the State did not establish beyond a reasonable doubt that either defendant provided the criminal agency that caused decedent's death.

A person commits involuntary manslaughter when he unintentionally kills an individual without lawful justification if his acts, whether lawful or unlawful, which caused the death, are such as are likely to cause death or great bodily harm to some individual if he performs them recklessly. (Ill. Rev. Stat. 1979, ch. 38, par. 9—3(a).) It is further recognized that "when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant." (*People v. Meyers* (1945), 392 Ill. 355, 359, 64 N.E.2d 531, 533.) It is sufficient if the evidence, as a whole, satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6), and in a bench trial, the credibility of witnesses and the weight to be given their testimony are for the trial court, whose judgment will not be disturbed unless the proof is so unsatisfactory that there appears a reasonable doubt of guilt (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64).

Here, we note that eight witnesses testified to having seen two white men either hit, kick, or stomp upon decedent in the CTA station. Blenda Caldwell stated that she saw a black man and two white men walking down the station stairs toward her, with each of the white men holding an arm of the black man; that after they passed, she saw the two white men throw the handcuffed black man against the wall and that his entire body, head, chest, and legs struck the wall; that while he was faced against the wall, the black man was

punched in the back and upper ribs by both white men; that as the black man lay on the ground with his hands behind him, the white men kicked him eight or 10 times; and that after he rolled onto his stomach, the men stomped on his back. Michael Caldwell stated that he saw two white men coming down the stairs on either side of a black man; that after they passed him, he saw the two white men throw or shove the black man against a wall several times; that one of the white men, with a red beard, held the black man against a cement post while the other white man kicked him above the knees and below the chest; that he later saw the man with the red beard press the black man's head against the cement and then saw a pool of blood under the man's head and neck; and that he saw no other person strike or kick the black man. Willis Crew observed a white man standing on the feet of a black man and another man near the head of the black man as he was lying on the ground; that he saw the man near his feet kick the black man in his side and the other white man hit him; and that the black man had blood on his face and shirt. Marilyn Brodsky said that she saw two men kicking a man on the ground in the station, and her nephew Jerry said that he saw two white men on either side of a black man who were punching and kicking him, and that he turned around as he walked up the stairs and saw the two men stomping and kicking the black man. Donnie Reynolds said that he saw a black man lying on the floor with one white man with a beard standing over him and another white man with his knee on the neck of the black man; that when he asked what was wrong, he was told by one of the white men that it was police business; that he saw blood on the right side of the black man's head and on the ground; and that he saw the white man who had his knee on the black man strike him in the head four times. Andrew Laties said he saw a black man lying on the ground with a large white man with light-colored sideburns squatting on the man's buttocks; that the white man leaned over the black man and struck him twice with his right hand at the base of the skull and top of the neck; that he (Laties) told another white man with a dark moustache who was there to stop the other man, and he replied, "Keep walking, this is police business"; and that he saw the large white man hit the black man a third time, and he noticed a pool of blood at the man's head.

Defendants make a number of arguments in support of their contention that the State failed to establish that either provided the criminal agency causing death. They first assert this to be so because no two of the State's witnesses testified to having seen the same thing. It appears to us, however, from the testimony of the eight State's

eyewitnesses, as set forth above, that their observations were from different locations and at different times, albeit within a few minutes of each other, as they passed through the CTA station, and we find no major discrepancies in their testimony.

Next, defendants argue that Dr. Stein's testimony in itself creates a reasonable doubt as to their responsibility. Specifically, they refer to his testimony that decedent's death resulted from a combination of events reacting within his body from the injuries he received, and he testified that those injuries occurred within two hours or less before death. Defendants point out that decedent was brought by them to the police station and had left their custody and control more than four hours before his death. They also maintain that when they brought decedent to the police station, he displayed no symptoms of fractured ribs or legs and that his actions negated a fractured neck, which were the principal injuries testified to by Dr. Stein. Thus, they suggest that those injuries did not occur while decedent was in their custody, and any of the other acts attributable to them would not be a sufficient cause of death.

We note, however, the considerable testimony as set forth above, of decedent having been kicked, hit, and stomped upon by defendants before he left their custody, and we note also that from the time the squadrol arrived at the CTA station until decedent was taken to the hospital several hours later, there is nothing in the record to indicate that injury was inflicted upon decedent by any other person or that he had injured himself. Although Officer Schumerth testified that in the processing room at the police station an evidence technician asked that he and his partner sit decedent in a chair so his picture could be taken and, when they tried to do so, decedent fell out of the chair three times onto his head, Schumerth did not say that he was injured in any of those falls. Furthermore, Officers Frenzel and Cuddy stated that they did not see decedent strike his head on the wall or floor while he was in the police station, and the evidence technician testified in rebuttal that decedent was in a chair while he was taking pictures but that no one propped him up and he did not see him fall out of the chair at any time. Moreover, while defendants say that decedent displayed no symptoms of serious injury to his legs when he was brought to the police station, the record discloses that the squadrol officers assisted him from the CTA station to their vehicle and that his feet were dragging when they assisted him into the police station and placed him on the floor, with no indication that he walked at any time thereafter. In light of the above, we believe that the record discloses the State sufficiently established that defendants inflicted injuries to

decedent which caused his death.

Next, defendants raise questions as to their identifications—particularly Earullo, who argues that no one identified him as one of the two men who struck or kicked decedent. We note, however, that the man with the red beard was identified by Michael Caldwell in a lineup and in court as Klisz. We note also that Blenda Caldwell testified that she saw two white men and a black man walking down the station toward her, with each of the white men holding an arm of the black man, and that she saw those two white men push the handcuffed black man against the wall, punch him in the back and ribs, kick him eight or 10 times, and stomp on his back. Michael Caldwell also saw two white men coming down the stairs on either side of a black man and said that one of the white men was thin with dark hair, and the other had long red hair, a bushy red beard, and a moustache, and that he saw the two white men throw or shove the black man against the wall several times and then saw the man with the beard hold the black man against a post while the other man kicked him above the knees and below the chest. Finally, we note that Beulah Phillips identified Klisz, Earullo, and Christiano as the officers who removed decedent from the train. When this testimony is considered with the testimony of both Klisz and Earullo that they walked down the stairs of the station on either side of decedent and were with him until he was assisted from the squadrol into the police station, we believe it clear that the involvement of each was established.

In light of the foregoing, it is our view that the evidence shows that the acts of both defendants in the CTA station were likely to cause great bodily harm and that they were performed in conscious disregard of a substantial risk. Further, in the absence of any testimony that decedent's death was caused by a supervening act disconnected from any act of defendants, his death is presumed to have resulted from their conduct. (See *People v. Meyers* (1945), 392 Ill. 355, 64 N.E.2d 531.) We conclude that defendants' guilt was established beyond a reasonable doubt.

■ Defendants next contend the trial court erred in denying their motion for mistrial based on an alleged inflammatory and prejudicial newspaper article. They maintain that because the trial court made numerous references to newspaper coverage of the trial, it was acutely sensitive to the media and that an article containing statements by a minister influenced its decision. In a bench trial of a criminal case, the trial court is presumed to have considered only competent evidence unless it appears from the record that he considered incompetent evidence which was prejudicial to the defendant. (*People*

*v. McGovern* (1970), 126 Ill. App. 2d 393, 261 N.E.2d 689.) In the instant case, it is our view that defendants' argument is speculative and not supported by the record. Furthermore, at the time the motion for mistrial was denied, the trial court stated "this Court is going to give these defendants a fair trial, and whatever anybody else says has absolutely no bearing upon my conduct \*\*\*. I am not taking any side issues and I'm not getting involved in any additional matters that have no concern as far as this Court is concerned with reference to the trial before this Court." We find no error in the denial of the motion for a mistrial.

■ Defendant Klisz next maintains that his right to remain silent was violated when the court permitted the State to show on cross-examination that he refused to make a court reporter statement.

The extent of cross-examination of a defendant lies within the discretion of the trial court, and a reviewing court will not interfere where there has been no clear abuse thereof. (*People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.) Further, the State may cross-examine a defendant on matters developed during his direct testimony in order to explain, modify, discredit, or contradict the direct testimony. *People v. Falkner* (1978), 61 Ill. App. 3d 84, 377 N.E.2d 824.

In the present case, the following colloquy occurred during the direct examination of Klisz:

"Q. And do you recall giving a statement?

A. Well, they called it an informal statement, sir. To explain what happened.

Q. Do you remember who you talked to?

A. I only remember two people in the room, sir. That was State's Attorney Quirk and Investigator Bruce from OPS.

Q. Now, did you give a statement?

A. I gave a summation of what happened, yes, sir.

Q. All right. Now, did you ever read that statement?

A. Yes, sir, sometime later.

Q. Did you read it on the night of the 14th?

A. No, sir.

Q. Did you read it at a later date?

A. Yes, sir.

Q. And after reading it, did—Strike that. Before you read it or after you read it, did you—did any police personnel ask you whether it was true and accurate?

A. No, sir.

Q. Did they ever ask you to make any corrections or deletions?

A. No, sir.

Q. You never signed a statement, as such, in this case, did you?

A. No, sir."

On cross-examination, the following occurred:

"Q. Is it your testimony that you were never given an opportunity to make a court reporter statement by Joseph Quirk, Assistant State's Attorney in connection with this case?

A. No, sir.

Q. You were given the opportunity?

A. Yes, sir.

Q. And you refused?

A. Yes sir."

It appears to us that the questions on direct examination were such that the prosecutor could reasonably have believed that counsel was inferring that the statement did not accurately include what defendant had said, because he was neither asked nor given the opportunity to read, sign, or correct the statement. Thus, the inquiry on cross-examination as to whether he had been given an opportunity to make a court reporter statement concerned a matter raised on direct examination, and in view thereof we believe the court did not err in allowing the cross-examination in question.

The reliance of Klisz on *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, is misplaced. In *Doyle*, it was held that the State may not constitutionally use a defendant's silence at the time of arrest, after receiving *Miranda* warnings, for impeachment purposes. Here, the cross-examination concerned the refusal of Klisz to make a court reporter statement prior to his arrest, which is not a violation of his fifth amendment rights. *People v. Hart* (1980), 92 Ill. App. 3d 272, 415 N.E.2d 1136.

■ We turn then to defendants' contention that they were deprived of a fair trial because the trial court refused to consider certain X rays identified by Dr. Hallenbeck which had been received in evidence. Concerning 10 X rays of various portions of decedent's body, this doctor testified in substance as follows: Those of the skull were underexposed, and he thus could not see any abnormalities; those of the lower left leg showed complete fractures of both bones; those of the right leg showed a fracture of the fibula; those of the abdomen and chest, although underexposed, did show two fractured ribs; and the remaining X rays were either over or underexposed so that he could not say whether there were other fractures.

In support of their contention that the trial court did not consider

the testimony as to these X rays, defendants suggest that while admitting the X rays in evidence, the court indicated that it would have refused them if the State had objected on the basis that a proper foundation had not been established. They refer to a statement of the court as follows:

> "With reference to the X-rays that were introduced, there was never a foundation as to the origin, when or who took them. It is not for the court to act as advocate in a trial. The presumption at law states that the court excludes all improper evidence in reaching its decision."

We note, however, that this quoted statement was made at the time it denied defendants' post-trial motion to exhume decedent's body. The court, in finding the motion to be untimely, also stated that it was satisfied that the testimony of Dr. Stein sufficiently established that decedent's death was caused by the injuries received.

Moreover, our examination of the record reveals no basis for defendants' conclusion that the trial court did not consider the testimony concerning the X rays. The record indicates that it did consider this testimony in a statement made when its decision was rendered that "I don't think it's appropriate or proper for me to comment with reference to the evidence in this case. I have considered all aspects of this case. I have considered the evidence ***." Furthermore, even were we to assume that the testimony concerning the X rays was not considered, we see no prejudice to defendant since (1) most of them were not diagnostic because of over or underexposure; (2) the X rays of the legs showed the same fractures found by Dr. Stein; and (3) Dr. Hallenbeck testified that an autopsy was a much more accurate way of determining whether a bone was broken.

■ Finally, defendants contend their sentences were excessive. The trial court is the appropriate forum to determine a suitable sentence, and its decisions in this regard must be accorded great deference and weight (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344), and a reviewing court may intervene only upon a showing that there was an abuse of the sentencing discretion entrusted to the trial court (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861).

We initially note that involuntary manslaughter and official misconduct are Class 3 felonies and that Earullo's sentences of 2½ years for each offense and Klisz' sentence of five years for official misconduct were within the statutory guidelines which provide that a person convicted of such felonies shall be sentenced to a term of not less than two years and not more than five years. Ill. Rev. Stat. 1979, ch.

38, par. 1005—8—1(b)(6).

The record discloses that decedent was arrested about 4:40 p.m. and, while his hands were handcuffed behind his back, he was struck, kicked, and stomped upon many times by each of the defendants and that this conduct caused the injuries resulting in his death at 9:14 p.m. that same day. The autopsy revealed multiple external contusions, extensive internal hemorrhaging, nine fractured ribs, a fracture of a spinous process in the neck, and fractures of both lower legs. It appears clear from the testimony of the State's witnesses and as found by the trial court that the participation of Klisz in the injuries to decedent was greater than that of Earullo. However, the latter was also actively involved in causing those injuries and, while defendants appear to have had exemplary records as police officers, were married, and had children, we believe under the totality of the circumstances that the sentences imposed on Earullo and the sentence imposed on Klisz for official misconduct are not excessive.

■ Turning then to the extended sentence imposed on Klisz for involuntary manslaughter, it is our belief that both defendants acted in an exceptionally brutal and heinous manner and, while the participation of Klisz appears to have been greater, there is no question that they were acting in concert and, to the extent of Earullo's participation, his actions were no less brutal or heinous than those of Klisz.

While the court's decision is normally given great weight in considering the propriety of the sentence imposed (*People v. Jackson* (1981), 100 Ill. App. 3d 1064, 427 N.E.2d 994), codefendants should not receive disparate treatment in sentencing (*People v. Cowherd* (1978), 63 Ill. App. 3d 229, 380 N.E.2d 21) unless they are not similarly situated with regard to rehabilitation potential (*People v. Jackson*) or the nature and extent of participation (*People v. Godinez* (1982), 91 Ill. 2d 47, 434 N.E.2d 1121). Further, a reviewing court is empowered to reduce sentences imposed by the court where there has been a clear abuse of discretion. 87 Ill. 2d R. 615(b)(4); *People v. Cowherd*.

Here, the disparity in the sentencing for Class 3 felonies under section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1) is justified because of the difference in the nature and extent of defendants' participation. However, the imposition of the extended term of eight years on Klisz for involuntary manslaughter on the finding under section 5—5—3.2(b)(2) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)) that the offense was accompanied by exceptionally brutal or heinous behavior is disparate and cannot be justified where no such extended term was imposed on

Earullo, whose actions to the extent of his participation were also exceptionally brutal and heinous. Accordingly, we reduce the sentence of Klisz for involuntary manslaughter from an extended term of eight years to the maximum term of five years for a Class 3 felony under section 5—8—1 of the Code, to run concurrently with his five-year sentence for official misconduct.

Summarizing, we affirm the convictions of defendants for both offenses; we affirm the sentences imposed on Earullo and that imposed on Klisz for official misconduct, but we reduce the sentence of Klisz for involuntary manslaughter from an extended term of eight years to a term of five years to run concurrently with his sentence for official misconduct.

Affirmed.

Sentence of one defendant reduced in part.

LORENZ and MEJDA, JJ., concur.