THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RONALD JACKSON, Defendant-Appellant.

First District (5th Division)   No. 83—2821

Opinion filed June 27, 1986.

Steven Clark and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Beth Herndobler, and Mary E. Shields, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant appeals from a conviction, after a jury trial, for murder, armed robbery, and conspiracy to commit murder. He was sentenced to serve concurrent terms of imprisonment, respectively, of 80 years for murder, 30 years for armed robbery, and 7 years for conspiracy to commit murder.

Defendant's conviction was based largely on the testimony of a codefendant, Shelanda Merrill. Merrill, in exchange for her testimony, received a dismissal of the murder, armed robbery, and conspiracy charges, and received an agreed sentence of three years and nine months for a guilty plea to concealment of a homicidal death. She was an admitted forger, pickpocket, and prostitute.

Merrill testified as follows: On the evening of December 21, 1981, she saw defendant, James Wilson, Albert Fields, and Ricky Knight, all Black Gangster Disciples street-gang members, at Chili Mac's Restaurant. Knight told Merrill to ask the eventual victim, Stella Fernandez, to come out of her house. Knight told Merrill he would be back and left Chili Mac's with defendant. Shortly afterwards, Merrill saw Stella in front of Chili Mac's. Merrill, afraid for her friend, told Stella to go home, but Stella refused. At 11:30 that evening, after Wilson and Fields had been arrested, Merrill and Stella went to the police station to arrange Wilson's release on bail. Subsequently, both Wilson and Fields were released.

Merrill, Fields, Wilson, and Stella then went to an apartment at

4410 South State Street. After they knocked, defendant opened the door with a sawed-off shotgun in his hand. After entering the apartment, Fields and defendant held a whispered conversation for about five minutes, after which Fields gave Stella two pills. After taking them, Stella went into the bedroom to lie down. Fields went into the bedroom followed by defendant with the shotgun. Merrill heard the victim yell, "stop, stop, stop, Stokes." (Stokes was Fields' nickname.) Merrill and Wilson went to the bedroom and saw defendant in the doorway still holding the shotgun, and saw Fields hitting Stella's face with his fists. Defendant then pointed the gun at Merrill and Wilson and ordered them into the bedroom. Fields removed money from the pocket of the unconscious Stella, and defendant went into the kitchen to get some cord.

Still holding the shotgun, defendant returned to the bedroom and gave the cord to Wilson who, in turn, handed the cord to Fields. Fields put the cord around Stella's neck and told Wilson to hold the cord. When Wilson refused, defendant told him to hold the cord or the same thing would happen to him. Thereafter Wilson held the cord while Fields pulled the cord around Stella's neck for about five minutes. When the victim failed to respond, Fields went into the bathroom and came back with a rubber hose which he put around her neck and pulled it with defendant. Afterwards, Fields dragged the victim to the bathroom and put her head in the toilet bowl for about three minutes. Defendant then put tape on the victim's mouth. Fields wrapped the body in a sheet and dragged it out of the building, put it in a garbage can, and dragged the can for several blocks. Merrill, Wilson, and defendant went with Fields. Defendant put some paper in the garbage can and ignited it, telling Merrill that she was not to say anything or the same thing would happen to her. The next day, Merrill and Wilson left on a prearranged trip to New York and then to California, where they were arrested.

Dr. Robert Stein, the chief medical examiner of Cook County, testified that the victim's cause of death appeared to be ligature strangulation. He also concluded that the victim was dead prior to being set on fire.

Joaquin Wilindez, a Chicago police officer testified next. Wilindez stated that he had been a gang specialist for about five years. His duties included gathering information and classifying, identifying, and apprehending gang members. He explained the organizational structure of the "Black Disciples" around 4410 South State. He identified Ricky Knight as the leader of the unit at 4410 South State, defendant as second in command, and Fields, known as "Stokes" or "Boo Boo,"

as the number three men in the unit. Wilindez' information was based on intelligence gathering from arrestees and other people. He had never met defendant.

Defendant took the stand and testified that he had lived all his life in the Robert Taylor Homes on South State Street and that he went to high school up to his third year. He was 22 years old on the date of the trial. Defendant's version of the events leading to the death of the victim differed substantially from Merrill's testimony. After meeting Fields in the hallway of 4410 South State, defendant responded "no" when Fields asked him if he had a pistol. Fields invited him to join Fields and the other three persons who were in an apartment "getting high." After gathering at the apartment, the group began smoking marijuana. Wilson, Fields, Merrill, and defendant stayed in the living room while the victim laid down in the bedroom. Wilson asked defendant into the bathroom where he told him the victim had stolen Fields' money. Fields then entered and asked defendant if he had a pistol. This time defendant said that he did. Fields told defendant that he wanted the pistol to kill Stella because she had taken his money. Defendant started to hand the pistol to Wilson, but took it back. Fields and Wilson protested and indicated that they would kill the victim in New York.

After smoking some more marijuana, Fields cut the telephone cord off and went into the bedroom where Stella was sleeping. Defendant heard the victim yell, "Stop, Stokes, stop." He leaned back in his chair in the living room and could see Fields punching the victim. Defendant testified that he told Wilson that Fields was beating the victim. Wilson then got up and went to the bedroom. Defendant leaned back again and saw Fields and Wilson pulling on both ends of the telephone cord which was around Stella's neck. Defendant and Merrill then went to the bedroom. Defendant said "Damn, why don't you let the girl go, you already done beat the girl." Fields responded that she took his money. Stella fell to the floor but opened her eyes. Merrill said, "that bitch ain't dead; kill that bitch. I hate that bitch." Merrill then hit the victim on the head with a milk crate, after which Wilson kicked Stella in the side. Fields then removed a roll of money from Stella's pocket. Wilson poured a cup of water in Stella's face, but she did not move. Fields next dragged Stella to the front room and rolled her into a sheet. Defendant started to leave when Fields asked him to help carry Stella's body downstairs. Defendant responded, "You have to get the body out the building the best way you can," and then left.

Subsequent to her arrest in California, Merrill told the police that

she knew nothing about Stella's murder. She testified that this was because defendant had told her she would be killed if she talked about the murder. On December 23, 1981, a Chicago police detective, Albert Jordan, spoke with Ricky Knight and his girl friend, Brenda Armstrong, about the killing at police headquarters. At that time, Armstrong made several telephone calls from the station. Afterwards, defendant called Detective Jordan. When asked if he knew anything about the murder, defendant said he did not. The detective asked defendant to come to the station and defendant declined. However, he did appear the next evening and was taken into an interview room to speak with Knight. Detective Henry Sigler testified that he was present in the room and that after Knight told defendant to tell the police what he knew about the murder, defendant gave his statement to the police.

After Merrill learned that defendant had implicated her in the killing, she told police that Fields and defendant had killed Stella. Defendant testified that he voluntarily went to the police and cooperated up until his arrest on January 12, 1982. He also testified that he had never owned a shotgun and had been a member of the Disciples between 1971 and 1975, but was not a member at the time of the murder. Defendant also stated that he did not try and stop Fields and Wilson because he was afraid of retaliation against his family. He also denied that Knight had told him to talk to the police.

The next State witness was Assistant State's Attorney LaBrenda White, who was permitted to testify over defense objections. The defense objected to her statements because the memorandum of her conversation with defendant was made available to him the day before her testimony. She testified that she spoke with defendant the evening of his arrest. Defendant told her that Fields grabbed defendant's pistol from him but that defendant got it back before anything happened to Stella. This statement was used at trial to impeach a portion of defendant's testimony.

Prior to trial, the defense made a discovery request for the "street file" concerning the crime. The trial court conducted an *in camera* inspection of the requested material. Both counsel were present; counsel for defense was not permitted to see the file. Thereafter, the trial judge ruled certain portions of the file to be nondiscoverable and allowed defense counsel to see only those portions the judge considered material and relevant to the case.

Following the trial, defendant was convicted of murder, armed robbery, and conspiracy to commit murder, and was sentenced to 80-years imprisonment. Albert Fields pleaded guilty to murder and

armed robbery and received a 30-year sentence.

Defendant raises nine issues on appeal.

I

Defendant's first argument concerns Officer Wilindez' opinion that defendant was a member of the Black Gangster Disciples street gang, and that he was second in command of the gang unit in his project building, Ricky Knight being the leader. The officer further stated that Albert Fields was third in command of the unit. Defendant contends that this information was based on unreliable and prejudicial hearsay, thus depriving him of his sixth amendment right to confrontation, and cites *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285, as support for this argument. In *Washington*, the court ruled that testimony of a gang investigator naming the defendant as a gang member at the sentencing hearing was inadmissible hearsay since the testimony was based solely on reports from an unnamed informant. Defendant also asserts that Officer Wilindez did not qualify as an expert because his opinion did not encompass any matters outside the knowledge of average laypersons.

In determining whether the officer's testimony is admissible, we find that resolution of this issue involves a three-part analysis: (1) whether the officer's testimony qualifies as expert opinion; (2) if so, is it relevant; and (3) does the prejudicial effect of that opinion outweigh its probative value.

A similar problem was addressed in *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671, *appeal denied* (1981), 85 Ill. 2d 579. In *Calderon*, a police investigator who had been with the gang-crimes unit for six years testified as to the defendant's gang membership. The investigator based his opinion on information he had gathered relating to gang activity over the years and on his observation of gang activities in the vicinity. The court held that this experience qualified the investigator as an expert, and citing *People v. Lamprey* (1979), 79 Ill. App. 3d 1065, 398 N.E.2d 1076, also noted that the determination as to the qualification of an expert witness lies within the discretion of the trial court. *People v. Calderon* (1981), 98 Ill. App. 3d 657, 661, 424 N.E.2d 671, *appeal denied* (1981), 85 Ill. 2d 579.

Generally, an expert witness is qualified if, because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person. (*People v. Johnson* (1975), 32 Ill. App. 3d 36, 46, 335 N.E.2d 144.) Specialized formal training is not necessary and experience may qualify one as an expert. (*People v. Lang* (1982), 106 Ill. App. 3d 808,

813, 436 N.E.2d 260.) Furthermore, an expert is permitted to state his opinion if the information upon which he is basing it is of a type reasonably relied upon by experts in the field, even though the information may not be admissible in evidence. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193-94, 417 N.E.2d 1322.

In the case at bar, Officer Wilindez testified that his opinion was based on five years' experience in the investigation of gangs in the area. His information was culled from a number of sources, including interviews both with arrestees and other people, observation, and infiltration of the gang. He further stated that he followed up these interviews by verifying and investigating the information he received. He did not repeat the actual words of his informants, but rather stated his opinion based on these conversations and on his own observations.

█ It is unlikely that the average layperson would have the same opportunity to observe and learn about the detailed hierarchy and activities of street gang so as to formulate expert evaluations as did Officer Wilindez and the gang-unit officer who testified in *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671, *appeal denied* (1981), 85 Ill. 2d 579. Moreover, *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285, relied upon by defendant, is distinguishable. In *Washington*, an investigator's testimony regarding defendant's gang membership was held inadmissible because it was based solely on information received from one unnamed informant. That is dissimilar to the present case since Officer Wilindez based his opinion on many different sources, including personal observation and gang infiltration, and his testimony that he verified and investigated information learned from others. Thus, the testimony of Officer Wilindez appears to be based on facts or data reasonably relied upon by experts in the field of street gangs. As a matter of practicality, the method of information gathering used by the officer is probably the only way a nongang member can accumulate details of gang activity and membership rank. Furthermore, Officer Wilindez' testimony is based on more data than are available to an average layperson. For these reasons, his testimony was properly qualified as expert opinion.

The second point we need to consider is whether Officer Wilindez' expert opinion is relevant. It is well settled that proof of gang membership is admissible only if there is also sufficient proof to show that membership is related to the crime charged. (See *United States v. Rosenberg* (2d Cir. 1952), 195 F.2d 583.) Our State supreme court considered relevancy of gang membership of a defendant being tried for both murder and solicitation of murder in *People v. Hairston* (1970),

46 Ill. 2d 348, 263 N.E.2d 840. The *Hairston* court ruled that testimony as to defendant's gang membership, if believed by the jury, was sufficient to permit a reasonable inference that defendant and other gang members present at the actual shooting were engaged in a common design and purpose, and that the murder or attempted murders were carried out as the result of an order given by defendant in his capacity as chief. 46 Ill. 2d 348, 372, 236 N.E.2d 840.

■ In the present case, the trial court held Officer Wilindez' testimony admissible for two reasons: (1) to rebut defendant's statement to police that he did not report the murder because he was afraid of gang members; and (2) to show that, because of his gang affiliation, defendant was involved in a conspiracy to cause the victim's death. Therefore, applying the analysis used in *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, these reasons are sufficient to show the relevancy of defendant's gang membership to the charge of conspiracy to commit murder.

■ We turn next to consideration of the prejudicial effect of Officer Wilindez' testimony. A trial judge has wide discretion in determining admissibility of expert testimony and that decision will not be overturned on review unless clearly and prejudicially erroneous. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 957, 455 N.E.2d 733.) Evidence which is otherwise relevant will not be excluded merely because it may prejudice the accused. (*People v. Calderon* (1981), 98 Ill. App. 657, 661, 424 N.E.2d 671, *appeal denied* (1981), 85 Ill. 2d 579.) In the case at bar, the expert testimony was admissible to support a reasonable inference that defendant and Albert Fields, as gang members, were engaged in a common design and purpose, *i.e.,* conspiracy to commit murder. The trial judge determined that the probative value of this expert testimony outweighed the possibility of prejudice to defendant, and we can not say that this ruling was clearly erroneous. We also note that Shelanda Merrill, an eyewitness to the killing, had already testified that Ricky Knight was the leader of a chapter of the gang, defendant was second in command, and Albert Fields was the third-ranked leader. Thus, the expert testimony of the gang-unit officer was only cumulative to prior properly admitted testimony and could not prejudice defendant.

For the foregoing reasons, we conclude that the trial court properly admitted Officer Wilindez' testimony as expert opinion.

## II

■ Shelanda Merrill testified that the victim told her that Albert Fields was pressuring her (the victim) to become a prostitute for him

and that she had refused. Defendant claims that this testimony is impermissible hearsay. Defendant also argues that the alleged hearsay greatly prejudiced him when the prosecutor used it in closing argument to infer that defendant was implicated in the prostitution scheme. The State counters with the argument that defendant has waived the issue by failing to include it in his post-trial motion. Additionally, the State contends that defendant's claim is without merit since the trial judge properly admitted the testimony to show the witness' state of mind, *i.e.*, that Merrill was afraid for her friend and warned her to go home.

If out-of-court statements are offered to prove the resulting effect of those statements on the listener's state of mind or to show why the listener acted as she did, the statements are not hearsay. (*People v. Reed* (1982), 108 Ill. App. 3d 984, 990, 439 N.E.2d 1277.) The *Reed* court also noted that the declarant's credibility was not an issue because the listener-witness could be cross-examined, and also commented on the reliability of the witness' testimony. The court opined that a grant of immunity or a plea bargain received by a witness is not sufficient reason for an accomplice's testimony to be disbelieved, especially where a jury has resolved the credibility issue by its verdict. 108 Ill. App. 3d 984, 991, 439 N.E.2d 1277.

In the present case, the testimony clearly shows that the information was solicited from Merrill to show why she told the victim to go home and not for the truth of the matters asserted, and thus, was properly admitted. It is also noted that the trial judge gave a cautionary instruction to the jury. In any event, we believe that the hearsay objection was waived by defendant by not including it in his post-trial motion. It is not sufficient that a party object to an error during the trial to preserve it for review; he must specifically raise it in his post-trial motion or it is waived. (*People v. Andino* (1981), 99 Ill. App. 3d 952, 954-55, 425 N.E.2d 1333.) Since we conclude that Merrill's testimony was properly admitted, the plain-error rule would not be applicable. As a result, the issue has been waived because defendant did not raise it in his post-trial motion. The prejudicial–closing-argument issue is addressed later in this opinion.

## III

Defendant next contends that it was reversible error to admit his statement to an assistant State's Attorney when the statement was not disclosed by the State until the second day of trial despite repeated discovery requests by the defense. The State mistakenly believed the paper already had been given to defense counsel. The state-

ments objected to were contained in an interview memorandum prepared by Assistant State's Attorney LaBrenda White on the night of defendant's arrest and were used to impeach portions of his testimony. After the objection, the trial judge informed defense counsel that he could talk with White for as long as necessary before she testified. The judge specifically ruled that if White did not cooperate, the State could not call her as a witness. He then asked defense counsel to specify how the memorandum differed from a police report made at the same interview and which had been tendered earlier to the defense. Defense counsel responded that the memorandum was more detailed than the police report, without specification. Counsel for the defense did not ask for a continuance nor did he avail himself of the opportunity to further investigate the matter. It is also noteworthy that the defense did receive the memorandum before defendant took the stand. Defendant argues that this sequence of events resulted in impeachment of his credibility by the State in a manner that it otherwise could not have used, thus creating surprise which prevented the defense from developing a strategy regarding the statements.

Supreme Court Rule 412 requires the State, upon written motion of defense counsel to disclose any written or recorded statements and the substance of any oral statements, made by the accused. (87 Ill. 2d R. 412(a)(ii).) This rule was discussed in *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321, wherein the court reasoned that the rule was promulgated to protect the accused against surprise, unfairness, and inadequate preparation. (102 Ill. App. 3d 702, 713, 429 N.E.2d 1321.) Furthermore, a trial court has discretion in allowing introduction of nondisclosed testimony where there is no showing of surprise or prejudice. The *Ferguson* court also stated that a defendant cannot complain when he fails to request a continuance for investigation of the statement, and instead proceeds with trial. *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 713, 429 N.E.2d 1321; see also *People v. Patterson* (1981), 102 Ill. App. 3d 844, 430 N.E.2d 574.

■ In the pending case, the trial judge gave defense counsel both an opportunity to specify his objections and also whatever time he needed to investigate the statements before defendant took the stand; counsel for the defense availed himself of neither opportunity. Since these alternatives were offered to the defense before defendant or White testified, the contention that defendant was prejudiced by surprise is without merit.

IV

■ Defendant's fourth allegation of error involves the trial

court's decision that only portions of defendant's "street file" should be turned over to defense counsel. He also objects to the court not allowing defense counsel to see the entire file during the *in camera* examination. Both counsel were present at the inspection; however, the court permitted only the State to view the file prior to its decision to turn over relevant portions to the defense. After examination of the *in camera* papers, we conclude that defendant had no right to inspect the file at the *in camera* proceedings. Defendant asserts that the holdings in *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, *aff'd* (1984), 104 Ill. 2d 96, 470 N.E.2d 993, and *People v. Coates* (1985), 109 Ill. 2d 431, 488 N.E.2d 247, are controlling on this issue.

In *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, *aff'd* (1984), 104 Ill. 2d 96, 470 N.E.2d 993, the trial court made an *in camera* inspection, outside the presence of both counsel, of the mental-health records of the only eyewitness to the crime, and subsequently refused to turn over any of the documents to the defense. In reversing, the appellate court held that, in spite of a statutory privilege, the mental history of a crucial witness may be relevant to his credibility. In this case, the eyewitness' records did contain relevant material. Under these facts, it would have been preferable for both counsel to have been present when the court examined the records to determine their materiality for impeachment of the eyewitness. (114 Ill. App. 3d 908, 915, 449 N.E.2d 1031.) In *People v. Coates* (1985), 109 Ill. 2d 431, 488 N.E.2d 247, the trial court conducted an *in camera* inspection of a witness' confidential records protected by the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1981, ch. 23, par. 2061). Neither counsel was present and the court did turn over portions of the records to defense counsel. The defendant in *Coates* objected to the manner of the *in camera* inspection. The supreme court dismissed defendant's objections and distinguished *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, *aff'd* (1984), 104 Ill. 2d 96, 470 N.E.2d 993, by stating that *Dace* stands "for the proposition that if either the witness or the therapist seeks to invoke the statutory privilege, the appropriate procedure is for the court to hold an *in camera* hearing in the presence of counsel for both sides." (*People v. Coates* (1985), 109 Ill. 2d 431, 437-38, 488 N.E.2d 247.) The *Coates* court further noted that the *Dace* opinion did not attempt to modify the rule that determination of whether material is discoverable and subject to disclosure is to be made by the circuit court. (109 Ill. 2d 431, 437, 488 N.E.2d 247.) This rule is consistent with the principle enunciated by the court in *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d

497, wherein it was held that case law which suggests that *in camera* proceedings to determine the discoverability of disputed material should be conducted in the presence of counsel for both parties does not expand the rule so as to require that defense counsel be allowed to examine the disputed material. The court commented that "such a requirement would completely defeat the purpose of *in camera* examinations." 30 Ill. App. 3d 1034, 1042, 333 N.E.2d 497; see also *People v. Buss* (1983), 112 Ill. App. 3d 311, 321, 445 N.E.2d 894 (defense counsel has no right to be present during *in camera* inspection).

■■ Applying the principles delineated in the above-cited cases to the present case, it is obvious that the trial court did have a right to examine the disputed file without showing the material to defense counsel. Admittedly, it would have been more appropriate if neither counsel had examined the file *in camera*. However, after examination of the material by this court, we conclude that the nondisclosed material is irrelevant and consists mainly of work-product documents, all of which the State had already seen when the file was in its possession. Therefore, any error in permitting the State to see the material during the *in camera* proceedings was harmless.

## V

■■ Defendant's assertion that he was not proved guilty beyond a reasonable doubt because Merrill's eyewitness testimony was given in exchange for dismissal of a murder charge against her is also without merit. The uncorroborated testimony of an alleged accomplice is sufficient to warrant a conviction, and the fact that the accomplice is a self-confessed criminal and expects leniency does not, of itself, raise a reasonable doubt. (*People v. Cowherd* (1980), 80 Ill. App. 3d 346, 349, 399 N.E.2d 672.) The existence of a promise of leniency goes to the credibility of the witness and his testimony, not to its admissibility. Thus, a beneficial plea-bargain agreement is not sufficient reason for an accomplice's testimony to be unworthy of belief, especially where the jury has resolved the issue of credibility by its verdict. (*People v. Reed* (1982), 108 Ill. App. 3d 984, 991, 439 N.E.2d 1277.) Moreover, if such testimony satisfied a jury that the defendant is guilty beyond a reasonable doubt, then a reviewing court should not disturb the verdict unless it is plainly apparent that the necessary degree of proof is lacking. *People v. Green* (1984), 125 Ill. App. 3d 734, 741-42, 466 N.E.2d 630.

However, our supreme court has held that uncorroborated accomplice testimony must be carefully scrutinized on appeal, and furthermore, where a witness expects leniency for testifying, that "testi-

mony should not be accepted unless it carries within it an 'absolute conviction of its truth.' [Citation.]" *(People v. Ash* (1984), 102 Ill. 2d 485, 493, 468 N.E.2d 1153.) A reviewing court may not substitute its judgment as to the weight of the evidence or the credibility of witnesses, but will reverse only if the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt as to defendant's guilt. *People v. Winfield* (1983), 113 Ill. App. 3d 818, 826, 447 N.E.2d 1029.

In the case at bar, Merrill admitted to being a pickpocket, forger, and prostitute. She also admitted that when first arrested, she had denied any knowledge of the crime. At trial, she explained that this was because, immediately after the murder, defendant had threatened her life if she talked. After defendant implicated Merrill in the murder, she then told the same story to police as she later recounted to the jury with minor inconsistencies. She was consistent in her statements regarding defendant's role in the crime. In the cases cited by defendant, there was contradictory testimony by several accomplices or material inconsistencies between an accomplice witness' earlier statements and his trial testimony. These circumstances are not apparent in the present case.

■■ In fact, the medical examiner found that the victim's cause of death was strangulation. There was no evidence to show that the victim had been hit in the head by a milk crate as testified to by defendant. By his own admission, defendant was present during the killing. These facts tend to corroborate Merrill's testimony. Defendant's denial of guilt is not corroborated by any of the evidence. It is also apparent from the record that the jury was well aware of the plea-bargain agreement between Merrill and the State, and it still found her consistent testimony more credible than the inconsistencies between defendant's pretrial statements and his testimony at trial. Therefore, under the facts of this case, we cannot say that the evidence was so improbable, impossible, or unsatisfactory as to raise a reasonable doubt of guilt.

## VI

■■ The State's closing arguments regarding defendant's alleged gang involvement were not reversible error. Defendant contends that, even though no objections were made at trial to the prosecutor's allegedly inflammatory statements in closing argument, this court should review their propriety under the plain-error rule or, alternatively, they should be considered because defense counsel acted incompetently by not objecting to them.

It has been consistently held that the failure to object to final argument constitutes a waiver by the defendant. (*People v. Harper* (1981), 94 Ill. App. 3d 298, 302, 418 N.E.2d 894.) However, defendant argues that the remarks were of such prejudicial effect that they amounted to plain error. Improper remarks constitute reversible error if they result in substantial prejudice to the accused and each case must be considered upon its own facts. (*People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200.) It is necessary to consider whether the verdict would have been different if the arguments had not been made. *People v. Harper* (1981), 94 Ill. App. 3d 298, 303, 418 N.E.2d 894.

One of the statements objected to by defendant refers to Ricky Knight as chief of the gang and that Knight ordered defendant to tell the police what happened because he (Knight) didn't want to "go down for this murder." A prosecutor may comment upon a witness' credibility. (*People v. Bryant* (1983), 94 Ill. 2d 514, 523-24, 447 N.E.2d 301), and if those comments are based on facts appearing in the proof or on legitimate inferences deducible therefrom, they are proper (*People v. Reyes* (1981), 102 Ill. App. 3d 820, 833, 429 N.E.2d 1277). Here, the State commented on defendant's testimony that he went to the police about the murder because he "felt it was wrong," and contrasted this story with a police officer's testimony that defendant denied any knowledge of the crime until after speaking with Knight at the police station, thereby questioning defendant's credibility. Even without the improper comment regarding Knight's conversation and motive, one could still reasonably infer that defendant, as a gang member, was following his leader's orders. Thus, the statement was not improper as it supported a reasonable inference. As a result, the improper statements regarding Knight were not so prejudicial as to require reversal.

Other comments objected to involved the way gangs operate by intimidating and terrorizing neighborhoods and witnesses, defendant's gang affiliation, the need to remove gang leaders from society, the insufficiency of police reports alone to obtain convictions against gang members, and that people in gang neighborhoods know who the leaders are and how they operate. Where the evidence of a defendant's gang affiliation is relevant and admissible, it need not be excluded because it might have a tendency to prejudice the defendant (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840), and it is entirely proper for a prosecutor to dwell upon the evils of crime and to urge the fearless administration of law (46 Ill. 2d 348, 375, 263 N.E.2d 840).

In the present case, both Merrill and Officer Wilindez testified as to defendant's gang affiliation and his position of leadership therein. Merrill also spoke of her fear of the gang and of defendant's threat of retaliation against her if she spoke out. The statements complained of appear to be reasonable inferences based on trial evidence. Although some of the prosecutor's remarks were perhaps better left unsaid (see *People v. Davis* (1986), 142 Ill. App. 3d 630, 640), they are not sufficient to invoke the plain-error rule. Moreover, it must be remembered that the State was trying to prove that defendant had participated in a conspiracy to commit murder with other members of his gang. Additionally, the trial judge instructed the jury that closing arguments are not evidence and any argument made that is not based on the evidence should be disregarded. It must be presumed that the jurors followed the court's instructions. (*People v. Bell* (1983), 113 Ill. App. 3d 588, 601, 447 N.E.2d 909.) Since the State's comments were based on the evidence or reasonable inferences drawn therefrom, we find no prejudice so substantial that the jury verdict would have been different had the comments not been made.

We now turn to an earlier contention by defendant regarding a comment by the State that the victim "was killed because she didn't want to become a part of them. She didn't want to work as a prostitute." Merrill's statement regarding the victim's refusal to work as a prostitute for Fields was not admitted to prove the truth of the matter asserted, but to show the effect on Merrill's state of mind. Thus, its use in closing argument was improper. At the close of trial, the judge instructed the jury that "any evidence which was received for a limited purpose should not be considered by you for any other purpose." An instruction was also given stating that remarks of counsel were not evidence.

Defendant did not object to the "prostitute" statement at trial nor did he raise the issue in his post-trial motion. It is therefore waived (see *People v. Bailey* (1982), 108 Ill. App. 3d 392, 402, 439 N.E.2d 4), and does not rise to the level of plain error. The record shows that the State referred to the prostitution issue only once. Where it appears that improper remarks are not a material factor in the conviction, the verdict will not be disturbed. (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363.) In our case, the court gave several applicable instructions to the jury. The State focused its closing argument on Merrill's consistent testimony concerning defendant's acts and upon the basis of his gang membership. Therefore, this isolated statement, even if objection thereto had not been waived, does not appear to be material to defendant's conviction, and thus,

does not mandate a reversal.

■■ As to defendant's assertion of ineffective counsel, we must examine the totality of the circumstances and the record as a whole. (*People v. Davis* (1981), 103 Ill. App. 3d 792, 796, 431 N.E.2d 1210.) As a whole, the record shows no reason that would establish that counsel's defense was so constitutionally deficient that it produced substantial prejudice to defendant, nor that a different outcome would have resulted but for counsel's errors. (See *Strickland v. Washington* (1984), 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2063, 2068.) Therefore, defendant's assertion regarding ineffective counsel is without merit.

## VII

■■ The trial court refused defendant's tendered non-IPI jury instruction concerning the credibility of accomplice witnesses who had received leniency in exchange for their testimony. The refused instruction stated: "In determining the credibility of accomplice witnesses, you have the right to take into consideration whether the accomplice witnesses have been promised consideration in relation to their punishment for their testimony." Instead the court instructed the jury, using Illinois Pattern Jury Instruction, Criminal, No. 1.02 (2d ed. 1981) (hereinafter cited as IPI Criminal 2d No. 1.02): "In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, and interest, bias or prejudice he may have and the reasonableness of his testimony considered in the light of all the evidence in the case." Illinois Pattern Jury Instruction, Criminal, No. 3.17 (2d ed. 1981) (hereinafter cited as IPI Criminal No. 3.17), regarding credibility of accomplice witnesses, was also given: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." After careful consideration of this issue, this court concludes that the trial court did not err in refusing defendant's tendered instruction for the following reasons.

Where the testimony of an accomplice incriminates the defendant, a cautionary instruction on the reliability of this testimony is required. (*People v. Robinson* (1974), 59 Ill. 2d 184, 190, 319 N.E.2d 772.) The generally accepted test as to whether a witness is an accomplice is whether that witness could have been indicted for the offense, either as principal or accessory. (*People v. Hrdlicka* (1931), 344 Ill. 211, 221-22, 176 N.E. 308.) Shelanda Merrill was indicted on January 29, 1982,

on charges of murder, armed robbery, conspiracy to commit murder, and concealment of a homicidal death. Therefore, despite the State's protestations to the contrary, under the above standard, Merrill was an accomplice witness and a cautionary instruction was required.

The trial court did give both IPI Criminal 2d Nos. 1.02 and 3.17. It is defendant's contention that these instructions were inadequate to inform the jury that it could consider the fact that Merrill received sentence consideration in exchange for her testimony. Defendant's argument substantially relies on the decision in *People v. Mostafa* (1971), 5 Ill. App. 3d 158, 274 N.E.2d 846. In *Mostafa*, although IPI Criminal Nos. 1.02 and 3.17 were given to the jury, the appellate court held that failure to instruct the jury as to any leniency given to witnesses was error where the entire case against the defendant was based on the uncorroborated testimony of four accomplices, all of whom received leniency in exchange for their testimony. The court stated: "[I]n a case like the one before us, an instruction must be worded so as to apply the rule to the case on trial. [Citation.]" (5 Ill. App. 3d 158, 168, 274 N.E.2d 846.) The *Mostafa* court concluded that because of this error and two other substantial errors, the case had to be reversed and remanded.

However, there are several important differences between the facts in *People v. Mostafa* (1971), 5 Ill. App. 3d 158, 274 N.E.2d 846, and the case at bar. In *Mostafa*, two of the witnesses admitted to being the actual killers; a third witness admitted to driving the "getaway" car. In our case, Merrill never admitted to any actual participation in the murder. Additionally, the *Mostafa* court noted that two of the witnesses had lied to the court on other important matters and that the evidence indirectly showed that their testimony that they had made no agreement with the State in exchange for testifying was false. In fact, it appears that the jury was probably unaware of the promised leniency to three of the witnesses. The court also noted that the testimony of the four accomplices was not only uncorroborated, but also was contradicted and impeached in important respects. And lastly, the testimony of defendant, who was shown to be a law-abiding citizen of good character, was partially corroborated by other witnesses.

None of these circumstances appear in the present case. Merrill's testimony was not substantially impeached nor contradicted, and it is clear that the jury was aware of her plea-bargain agreement with the State. Furthermore, there is no corroboration of defendant's testimony in our case. All of these facts distinguish the present case from *Mostafa*.

However, the decision in *People v. Parks* (1975), 34 Ill. App. 3d 180, 340 N.E.2d 121, *rev'd on other grounds* (1976), 65 Ill. 2d 132, 357 N.E.2d 487, is applicable to the case at bar. In *Parks*, the defendant was convicted of armed robbery solely on the testimony of an accomplice who received leniency in exchange for testifying. IPI Criminal No. 1.02 was given to the jury (IPI Criminal No. 3.17 was not given at defense counsel's request). In commenting on the trial court's failure to give a defense instruction regarding leniency to an accomplice witness, the *Parks* court held that such an instruction should be given only when there is no applicable pattern instruction or when the pattern instruction inaccurately states the law. Moreover, the instruction given in *Parks* adequately informed the jury regarding credibility of witnesses; therefore no further instruction was necessary. The court concluded that to hold otherwise would defeat the purpose of the pattern instructions. 34 Ill. App. 3d 180, 184, 340 N.E.2d 121.

In the pending case, both IPI Criminal 2d Nos. 1.02 and 3.17 were given. Additionally, the jury was well aware of the fact that Merrill received a sentence of three years and nine months for concealment of a criminal homicide in exchange for her testimony. She admitted to it at trial, defense counsel mentioned it many times during trial and in his closing argument, and in fact, the State called the jury's attention to the fact twice in its closing argument, both times in reference to the two pattern instructions discussed above. In view of these circumstances and the principle that approved uniform instructions are to be used and may be modified only when the facts make them inadequate (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 543, 464 N.E.2d 659), the trial court properly refused defendant's tendered instruction.

## VIII

Next, defendant argues that his extended 80-year sentence was excessive where the admitted killer, Albert Fields, was sentenced to only 30 years. Shelanda Merrill testified that Fields gave Stella (the victim) pills and that he alone went back into the bedroom and assaulted her. Subsequently, defendant followed and shortly thereafter Merrill and Wilson went also. Fields was beating Stella while defendant stood by with a shotgun. Fields then took money from the unconscious victim's pocket. Defendant left the room and returned with a cord which Wilson and Fields used to strangle Stella for about five minutes. Fields then got a rubber hose which he and defendant pulled around Stella's neck, after which Fields dragged her to the bathroom

and held her head in the toilet bowl. Defendant then put tape on her mouth and Fields dragged the body out of the building and stuffed it in a garbage can. Later, defendant set the can afire.

Defendant had two juvenile convictions: grand theft for which he was sentenced to nine months in a juvenile correctional center and burglary with two years' probation. As an adult, he had an unlawful use of weapon conviction and a robbery conviction with probation. Fields had two prior felony convictions, for theft and attempted theft, and served time in State penitentiaries. At the time of their respective sentencing, Fields was 27 years old and defendant was 22 years of age. Fields pleaded guilty and received concurrent 30-year sentences for armed robbery and murder, respectively; after trial, defendant was sentenced to an extended term of 80 years for murder, 30 years for robbery, and seven years on the conspiracy conviction, to run concurrently.

It is well settled that it is not the function of a reviewing court to serve as a sentencing court and absent an abuse of discretion, a sentence will not be disturbed on review. (*People v. Holloway* (1983), 119 Ill. App. 3d 1014, 1022, 457 N.E.2d 466.) At the same time, however, fundamental fairness and respect for the law require that defendants similarly situated should not receive grossly disparate sentences. (*People v. Cook* (1983), 112 Ill. App. 3d 621, 623, 445 N.E.2d 824.) "Similarly situated" refers to rehabilitation potential or the nature and extent of participation. (*People v. Earullo* (1983), 113 Ill. App. 3d 774, 792, 447 N.E.2d 925.) However, a disparity in sentencing may be supported by a more serious criminal record or greater participation in the offense than the individual with whom the defendant's conduct is compared. *People v. Maxwell* (1985), 130 Ill. App. 3d 212, 219, 474 N.E.2d 46.

The record in the present case does not support a disparity of 50 years between the sentences of defendant's and Fields'. Their criminal records are not dissimilar to any extent, except that Fields has served time in a penitentiary whereas defendant has not. We also note that defendant's youth and work record were in evidence as mitigation factors. Moreover, at trial the State referred to defendant as not being the prime mover or initiator of the crime. And, at defendant's sentencing hearing, the State admitted that there were two reasons for the crime—the stealing of money from Fields by the victim and her refusal to work as a prostitute for Fields. Fields is the person who gave Stella the pills, beat her into unconsciousness, initially strangled her for five minutes and then robbed her, pulled a hose around her neck with defendant's participation, stuck her head in the

toilet, and put her in a garbage can. There is no mention of brutal and heinous behavior in the record of Fields' sentencing hearing. Under these circumstances, it appears that the acts of Fields showed him to be the more active participant in a brutal and heinous crime. Therefore, defendant's disparate sentence cannot be justified. See *People v. Earullo* (1983), 113 Ill. App. 3d 774, 447 N.E.2d 925.

Supreme Court Rule 615(b)(4) (87 Ill. 2d R. 615(b)(4)) authorizes this court to reduce a sentence imposed in the trial court. Accordingly, we affirm defendant's conviction for murder and reduce that sentence from an extended term of 80 years to a term of 30 years under section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(1)), to run concurrently with his maximum 30-year sentence for armed robbery.

## IX

■ Lastly, we find that defendant's conviction for conspiracy to commit murder was improper pursuant to section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 8—5), which states that no person can be convicted of both the inchoate and the principal offense. Therefore, pursuant to Supreme Court Rule 615(b)(2) (87 Ill. 2d R. 615(b)(2)), we must set aside the conspiracy conviction.

In summation, we affirm defendant's convictions for murder and armed robbery; his conviction for conspiracy to commit murder is vacated; and we reduce the extended 80-year sentence for murder to 30 years, to run concurrently with the 30-year sentence for armed robbery.

Affirmed in part, vacated in part, sentence partially modified.

SULLIVAN, P.J., and LORENZ, J., concur.