**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180651-U

Order filed July 22, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0651 Circuit No. 17-CF-828 |
| DEVEONTE S. HOLMES, | ) ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Lytton and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   (1) Evidence presented by the State was sufficient to allow a rational trier of fact to conclude that the gun used in the course of the robbery could cause serious injury if used as a bludgeon; and (2) the circuit court's imposition of identical sentences for codefendants was not an abuse of discretion.

¶ 2     Defendant, Deveonte S. Holmes, appeals following his conviction for armed robbery. He

argues that the evidence introduced at trial was insufficient to establish beyond a reasonable

doubt that a dangerous weapon was used in the course of the robbery. He also argues that his

sentence of 12 years' imprisonment was unconstitutional in comparison to that of his codefendant. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant and codefendant, Eutacius Evans, were charged via indictment with armed robbery (720 ILCS 5/18-2(a)(1), (b) (West 2016)) and aggravated robbery (*id.* § 18-1(b)(1), (c)). The armed robbery charge alleged that defendant and Evans stole money from Eric Chavez "while armed with a dangerous weapon, a bludgeon."

¶ 5                                       A. Trial

¶ 6        The matter proceeded to a joint bench trial. Chavez testified that his acquaintance, James Hoehn, asked if Chavez could procure a gun for him. Chavez, in turn, contacted Evans to inquire about purchasing a gun. Evans indicated that he had a gun and agreed to sell it to Chavez. Hoehn subsequently picked Chavez up and drove to a prearranged location to meet Evans. Hoehn brought $400 in cash to purchase the gun.

¶ 7        Chavez was in the front passenger seat when he and Hoehn arrived at the location. Evans entered the car, sitting on the passenger side of the backseat. Evans was with a man who Chavez identified as defendant. Defendant stood by Chavez at the front passenger window. After Evans was in the car, Chavez testified: "he pulls out a gun and puts it to the back of my head." Evans demanded the money from Chavez. Chavez added that defendant was "pretty much saying the same thing" and "swung at" him. Chavez gave the money to Evans. At that point, "[p]olice swarmed from everywhere and then [Evans and defendant] took off running."

¶ 8        On cross-examination, Chavez clarified that he never saw a gun; he merely felt something on the back of his head. The object felt hard and did not feel like plastic. Chavez suffered no injuries.

¶ 9        Hoehn testified that he was working as an informant for the Bureau of Alcohol, Tobacco, and Firearms (ATF) when he arranged for Chavez to purchase a gun. The ATF provided the money for the transaction. According to Hoehn, both Evans and defendant demanded the money. Shortly thereafter, "they upped the gun that we thought was real at the time." Chavez turned over the money, though Hoehn could not recall whether he gave it to Evans or defendant. Hoehn recalled that while the gun[1] was at the back of Chavez's head, defendant was "[p]unching [Chavez] through the window."

¶ 10       Hoehn's car was equipped by the ATF with surveillance equipment, which recorded the entire incident. The video was played in court. It shows Chavez and Hoehn in the front seat of a car when a man enters and sits in the passenger side backseat. The man in the backseat begins demanding the money, at which point the arms of a man standing outside of the passenger window become visible. Two voices can be heard demanding money, while both men pull and grab at Chavez. One of the arms from outside the car can be seen grabbing first at Chavez's shirt and then at the front pocket of Chavez's pants, the same pocket from which he had extracted the money. Chavez leans away because of the low camera angle on the video, any object in the backseat passenger's right hand cannot be seen. After 30 seconds, both men leave and police sirens are heard in the background.

¶ 11       Hoehn testified that after the incident he met with his contact at the ATF. A search of his car revealed, in Hoehn's words, a "BB gun or air soft gun" in his backseat. It had not been there before the incident. Hoehn believed it was the object pressed to the back of Chavez's head.

---

[1]The item wielded by Evans in the course of the robbery is variously referred to throughout the record as a gun, a pistol, a BB gun, or a pellet pistol. We will follow the example of numerous other courts addressing similar issues in simply referring to that object as a "gun" throughout our opinion, though no inferences should be drawn from our use of this terminology.

¶ 12    ATF Special Agent Joseph Dynes was conducting surveillance of the controlled buy through a live audio feed. Upon hearing that "the deal was not going according to plan," Dynes activated his lights and sirens. When he arrived at the scene, defendant was already on the ground and in custody. Evans had fled and was being pursued down an alley.

¶ 13    Dynes later searched Hoehn's car and found "what turned out to be an air soft pistol." It had not been there prior to the incident. Dynes also referred to the object as a "pellet gun." Dynes described the object as a "Daisey Power Line," resembling some type of black handgun. Dynes added: "Looks like there is metallic portions inside it, as well as beveled edges." Asked to determine a weight for the object, Dynes stated: "Approximately maybe five pounds, ten pounds. Probably more around five." Writing on the surface of the item said "warning. Not a toy. Misuse or *** careless use may cause serious injury or death. For use by ages 16 or older."

¶ 14    ATF Special Agent Andrew Karceski also conducted surveillance of the controlled buy. After the robbery became apparent, Karceski drove his vehicle to the front of Hoehn's vehicle. Karceski observed defendant reaching into the vehicle through the passenger window. Karceski exited his vehicle, pointed his weapon at defendant, and ordered him to the ground. Defendant complied and Karceski apprehended him.

¶ 15    While Karceski was ordering defendant to the ground, he saw the rear passenger door open. Evans emerged and began to flee. Once defendant was secure, Karceski proceeded to the alley through which Evans had fled. Karceski found cash and a cell phone belonging to Evans on the ground. Evans had fled into a nearby residence. After law enforcement officers surrounded the residence, Evans emerged and was taken into custody.

¶ 16    The State introduced into evidence photographs of text messages exchanged between defendant and Evans prior to the incident. In one text message, Evans asked defendant: "Ay

4

whats the name of the pretendo u gt lord[?]" Defendant replied: ".40[.] Power line." In later interviews with the ATF, defendant admitted that he had provided the gun for the robbery.

¶ 17    At the close of the State's evidence, defendant and Evans each moved for a directed verdict on both counts. With respect to the armed robbery charge, they argued that no evidence had been presented demonstrating that the "fake gun" could be used as a bludgeon. The State pointed out that Dynes had estimated the item to weigh approximately five pounds and testified that it had metallic portions. The State also noted that the court had been able to hold the item and could therefore "determine that [it] was a weighty weapon."

¶ 18    The court denied the motions. Regarding the armed robbery count, the court commented: "[A]s far as the testimony about the black gun, I mean, I held it. It was a good five—I mean the officer testified five pounds. It was heavy. It was black. It had some metal on it. It looked like a gun."

¶ 19    Defendant and Evans each declined to testify.

¶ 20    The court found defendant and Evans guilty on both counts. With respect to the armed robbery charge, the court found that the item needed only the potential to be used as a bludgeon. The court continued: "I got a chance to look at it and feel it, and to me, my opinion based upon the evidence and how I felt, it was at least five to ten pounds. It was six to ten inches long ***. It looks like a real gun." The court also observed that Chavez and Hoehn believed the gun was real, concluding "So there's subjective belief that was a gun. And the objective evidence indicated it was dangerous."

¶ 21                                    B. Sentencing

¶ 22    Prior to a joint sentencing hearing, a presentence investigation report (PSI) was filed for both defendant and Evans. Defendant's PSI indicated that he had one other adult felony

5

conviction, that being for the Class 4 offense of unlawful possession of a controlled substance. Defendant received a sentence of 24 months' probation for that charge. The PSI also showed two delinquency adjudications for defendant, for misdemeanor theft in 2012, and Class 1 residential burglary in 2014, when he was 17 years old. Defendant was 20 years old at the time of the armed robbery.

¶ 23     Evans's PSI indicated that he was convicted in 2012 for Class 1 residential burglary and sentenced to four years' imprisonment. In 2015, he was convicted of Class 3 aggravated battery and misdemeanor domestic battery and was sentenced to two years' imprisonment on the more serious charge. He had a separate conviction for misdemeanor domestic battery in 2017. Evans was 23 years old at the time of the armed robbery. The State also presented extensive evidence at sentencing demonstrating that both defendant and Evans had gang affiliations.

¶ 24     The State requested that the court sentence defendant to a term of 15 years' imprisonment. It requested that the court sentence Evans to a term of 20 years' imprisonment. Likewise, counsel for defendant suggested the minimum sentence of six years' imprisonment. Counsel for Evans suggested a term of six to eight years' imprisonment.

¶ 25     The court sentenced both defendant and Evans to a term of 12 years' imprisonment for armed robbery. In doing so, it stated: "Though you don't have the exact same criminal history, it's similar in the fact that you have in juvenile, as to [defendant], I believe it was residential burglary. Mr. Evans, it was as an adult." The court noted that neither man had "ever finished a sentence successfully." The court found defendant and Evans "equally culpable and responsible" in the commission of the offense.

¶ 26　　　　Defendant filed a motion to reconsider sentence. In the motion, he argued that the court failed to properly consider his PSI and criminal history. The court denied the motion. In doing so, the court again commented that defendant "had similar crimes as [Evans] in juvenile court."

¶ 27　　　　　　　　　　　　　　　II. ANALYSIS

¶ 28　　　　On appeal, defendant argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that the object wielded by Evans during the course of the robbery was susceptible to use as a dangerous weapon, as contemplated by the armed robbery statute. Defendant also argues that his sentence of 12 years' imprisonment, the same sentence received by Evans, was in violation of the constitutional bar on disparate sentences.

¶ 29　　　　　　　　　　　　A. Sufficiency of the Evidence

¶ 30　　　　When a challenge is made to the sufficiency of the evidence, we review to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In making this determination, we review the evidence in the light most favorable to the prosecution. *People v. Baskerville*, 2012 IL 111056, ¶ 31. Determination of witness credibility and the drawing of reasonable inferences from the evidence are among the responsibilities of the trier of fact. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). While such determinations made by the trier of fact are entitled to deference on review, they are not conclusive. *People v. Brown*, 2013 IL 114196, ¶ 48. "Rather, a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 31　　　　As charged in the present case, a person commits the offense of armed robbery where, in the course of committing a robbery, "he or she carries on or about his or her person or is otherwise armed with a dangerous weapon other than a firearm." 720 ILCS 5/18-2(a)(1) (West

7

2016). "Dangerous weapon" is not defined in the armed robbery statute. *Id.*; *People v. Ligon*, 2016 IL 118023, ¶ 21. "[W]hat constitutes a dangerous weapon is a question of fact and includes any object sufficiently susceptible to use in a manner likely to cause serious injury." *Ligon*, 2016 IL 118023, ¶ 21. In turn, "[w]hether an object is sufficiently susceptible to use in a manner likely to cause serious injury is generally a question of fact." *People v. Ross*, 229 Ill. 2d 255, 275 (2008).

¶ 32     Our supreme court has made clear that even an unloaded gun[2] may be deemed a dangerous weapon. *People v. Skelton*, 83 Ill. 2d 58, 66 (1980). "Most, if not all, unloaded real guns and many toy guns, because of their size and weight, could be used in deadly fashion as bludgeons." *Id.* Further, the court has rejected an approach that would require an unloaded gun to be actually used or threatened to be used as a bludgeon in order for it to qualify as a dangerous weapon:

> "Since the robbery victim could be quite badly hurt or even killed by such weapons if used in that fashion, it seems to us they can properly be classified as dangerous weapons although they were not in fact used in that manner during the commission of the particular offense. It suffices that the potential for such use is present; the victim need not provoke its actual use in such manner." *Id.*

Thus, "[t]he State may prove that a gun is a dangerous weapon by presenting evidence that the gun was loaded and operable, or by presenting evidence that it was used or capable of being used as a club or bludgeon." *Ross*, 229 Ill. 2d at 276.

---

[2]We note that there was no affirmative testimony at trial concerning whether the gun was loaded or unloaded. Of course, it would have been the State's burden to establish that the gun was loaded. In any event, the parties below, the circuit court, and the parties on appeal have all proceeded under the premise that the gun was not loaded, and we will do the same.

¶ 33       In *Ross*, the court explained that *Skelton* has given rise to an approach wherein weapons may be arranged into three tiers:

> "(1) objects that are dangerous *per se*, such as loaded guns; (2) objects that are not necessarily dangerous, but were actually used in a dangerous manner during the robbery; and (3) objects that are not necessarily dangerous, but may become dangerous when used in a dangerous manner." *Id.* at 275.

Thus, in order to prove that a gun constituted a dangerous weapon, the State must prove: "(1) the gun was operable and loaded; (2) the gun was actually used during the offense as a club or bludgeon; or (3) that due to the gun's size and weight, it was capable of being used as a club or bludgeon." *People v. Dixon*, 2015 IL App (1st) 133303, ¶ 25. Within the third tier of weapons, the court has endorsed an objective approach, wherein it is the nature of the weapon, rather than the victim's subjective perception of the weapon, that controls. *Ross*, 229 Ill. 2d at 274-75.

¶ 34       In considering whether an object "is sufficiently susceptible to use in a manner likely to cause serious injury," courts will consider, the size, weight, composition, and feel of the object. *Id.* at 275. In *Skelton*, for example, the court found that the toy gun in that case "is entirely too small and light in weight to be effectively used as a bludgeon as could the metal air pistol in" a different case. *Skelton*, 83 Ill. 2d at 66. The court also observed that, "[e]xcept for the cylinder, [the toy gun] is constructed entirely of hard plastic. The cylinder is a thin, tinny metal." *Id.* at 61. The *Skelton* court thus concluded that the toy gun "simply is not, in our opinion, the type of weapon which can be used to cause the additional violence and harm which the greater penalty attached to armed robbery was designed to deter." *Id.* at 66-67.

¶ 35       Similarly, the court in *Ross* found that the mere description of a "177-caliber pellet gun with a three-inch barrel," without evidence that it was loaded and operable, was insufficient to

establish susceptibility to use as a dangerous weapon. *Ross*, 229 Ill. 2d at 277. The court noted that the State had failed to introduce evidence of the gun's weight and composition, or to introduce the actual gun into evidence. *Id.*

¶ 36    Where reviewing courts have found that the object used in the robbery was a dangerous weapon, they commonly note that an object is metal or that it is heavy. See *People v. Thorne*, 352 Ill. App. 3d 1062, 1073 (2004) (collecting cases). The presence of jagged or sharp edges may also be a relevant consideration. *E.g.*, *People v. Lindsay*, 263 Ill. App. 3d 523, 530 (1994).

¶ 37    Before turning to our own examination of the gun in this case, we are compelled to make a small clarification with respect to existing case law. While courts most often invoke the weight or composition of an object, these terms are insufficient and at times imprecise. For instance, there is no magic weight at which an object becomes susceptible to use as a bludgeon. See *People v. Bayless*, 99 Ill. App. 3d 532, 538 (1981) (finding 5.88-ounce toy gun capable of causing serious harm if used as a bludgeon). In fact, it is not even the weight of an object, *per se*, that renders it capable of use as a bludgeon. Consider that a five-pound sack of pillows is not likely to be as dangerous as a five-pound metal rod. We surmise that it is the density of an object, rather that its weight, that is probative of its bludgeon capability.

¶ 38    A similar observation may be made of the composition of an object, that is, whether it is made of metal, plastic, or some other material. Notably, the gun in *Skelton*—the most prominent case in which an object was found not susceptible to use as a bludgeon—*was* made partially of metal. *Skelton*, 83 Ill. 2d at 61. However, the court noted that it was a "thin, tinny metal." *Id.* Like metal, plastics may also exist in various forms. For instance, a plastic water bottle is thin and flimsy, but a dense, hard plastic might be susceptible to use as a bludgeon. Thus, it is not the material itself that is probative, but the more specific nature of the object. In addition to density,

10

we also note that portability (whether the object may be grasped and swung), hardness, and durability (whether the object is likely to break upon impact) are relevant factors to be considered, though they are less commonly, if ever, referenced in case law on this issue.

¶ 39 This court has undertaken its own examination of the evidence in this case. First, we note that the circuit court's estimate that the gun weighed 5 to 10 pounds is, quite literally, contrary to the manifest weight of the evidence. The gun is no more than one pound. Nevertheless, it is substantial. It is made of a hard, rigid plastic, and feels weighty. The majority of that weight is in the handle, which houses a metal canister. At approximately seven inches long, the gun could easily be gripped by the barrel in order to bludgeon with the handle.

¶ 40 In sum, a rational trier of fact could conclude that the gun in this case could cause serious injury if used as a bludgeon. We therefore find the State's evidence sufficient to sustain defendant's conviction for armed robbery.

¶ 41                                    B. Disparate Sentencing

¶ 42 Defendant next argues that the circuit court's imposition of identical sentences for him and Evans was in violation of disparate sentencing principles where he and Evans were not similarly situated. Specifically, defendant points out that, unlike Evans, he had no violent felony convictions and had spent no time in the Department of Corrections (DOC). Defendant concedes that he did not fully preserve this issue, but requests that we review it under the rubric of plain error. Of course, the first step in any plain error analysis is to determine whether a clear, obvious, or plain error has been committed. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 43 Fundamental fairness and due process require "that similarly situated defendants not receive grossly disparate sentences." *People v. Fern*, 189 Ill. 2d 48, 58 (1999); *People v. Stapinski*, 2015 IL 118278, ¶ 51. The "[a]rbitrary and unreasonable disparity between the

11

sentences of similarly situated codefendants is impermissible," and an error of constitutional magnitude. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). " 'Similarly situated' refers to rehabilitation potential or the nature and extent of participation. [Citation.] However, a disparity in sentencing may be supported by a more serious criminal record or greater participation in the offense ***." *People v. Jackson*, 145 Ill. App. 3d 626, 646 (1986) (quoting *People v. Earullo*, 113 Ill. App. 3d 774, 792 (1983)).

¶ 44       Illinois courts have also recognized a corollary to the bar on disparate sentences for similarly situated codefendants. That is, it may be impermissible for *dis*similarly situated codefendants to receive the *same* sentence. *E.g.*, *People v. Klimawicze*, 352 Ill. App. 3d 13, 31 (2004). As this court has stated:

> "[T]here can be an abuse of discretion when two codefendants are given the same sentence, although having widely different criminal records and different roles in the particular crime, and where there is a difference in other pertinent factors which are commonly used to evaluate the proper punishment required." *People v. Stambor*, 33 Ill. App. 3d 324, 326 (1975).

Thus, an abuse of discretion may be found where codefendants (1) are given identical sentences; (2) have "widely different criminal records"; (3) played different roles in the offense; and (4) a difference exists in the other pertinent sentencing factors with respect to each codefendant. *Id.*

¶ 45       Defendant insists that Evans "bears more responsibility for the armed robbery" because he planned the robbery, actually held the gun during the robbery, and fled afterward. We disagree. While defendant did not hold the gun to Chavez's head, it was defendant who provided the gun in the first place. Further, while Evans wielded the unloaded gun, defendant attempted to punch Chavez in order to procure the money. Defendant grabbed at Chavez's shirt and pants

12

while demanding the money and blocking Chavez's route of escape. Moreover, we note that defendant cannot be credited for surrendering to custody out of some concern for officer or public safety. Rather, where Karceski had his weapon pointed directly at defendant while ordering him to the ground, it seems that defendant simply did not have the same opportunity to flee as did Evans. In short, the court's finding that defendant and Evans were "equally culpable and responsible" for the armed robbery was not erroneous.

¶ 46 We also reject defendant's contention that there are "significant differences" between his and Evans's criminal backgrounds. (Br. At 6). To be sure, Evans had been convicted of one more felony than defendant, and for a higher class of felony. See *supra* ¶¶ 22-23. Evans had been previously sentenced to DOC custody while defendant had not. Yet, the disparity between defendant's PSI and Evans's PSI does not demonstrate the "widely different criminal records." *Id.* As the circuit court correctly pointed out, neither defendant nor Evans had ever successfully completed a sentence.

¶ 47 Defendant also insists that "the court erroneously equated [defendant's] juvenile adjudication for residential burglary with Evans's adult conviction for residential burglary," contrary to well-established principles relating to the culpability of minors. We disagree with defendant's characterization. The circuit court here did no more than cite a similarity between the two criminal records. The court did not "equate[ ]" the two offenses by stating or implying that they were of equal significance in its sentencing decision. In fact, each time the court mentioned those offenses, it explicitly recognized that defendant's offense was a juvenile adjudication.

¶ 48 Finally, defendant makes no argument that any "other pertinent factors which are commonly used to evaluate the proper punishment required" favor disparate sentences between

13

himself and Evans. *Id.* We note only that defendant and Evans were of similar age at the time of the offense and were both affiliated with gangs. If anything, the other pertinent factors tend to indicate that defendant and Evans *were* similarly situated codefendants.

¶ 49     Accordingly, we conclude that the circuit court did not abuse its discretion by imposing identical sentences upon defendant and Evans. Because we find no clear or obvious error, we need not proceed further in our plain error analysis.

¶ 50                          III. CONCLUSION

¶ 51     The judgment of the circuit court of Will County is affirmed.

¶ 52     Affirmed.